UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Northern Division

| | | |
|---|---|---|
| FAIRBANKS CAPITAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. AMD02CV2587 |
| | ) | |
| W. CRAIG KENNEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFF'S POST-HEARING BRIEF IN SUPPORT
OF MOTIONS FOR PRELIMINARY INJUNCTION

Frederick W. Chockley (Bar #04278)
Gary Rinkerman
Mark I. Bailen (Bar #13805)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW,
Suite 1100
Washington, DC  20036
(202) 861-1680
(202) 861-1783 (Fax)

Attorneys for Plaintiff

TABLE OF CONTENTS

Page

Introduction ................................................................................................................. 1

I.    THE COURT SHOULD ENTER A PRELIMINARY INJUNCTION
      ENJOINING DEFENDANTS' INFRINGEMENT OF FAIRBANKS'
      MARK .............................................................................................................. 3

      A.    Fairbanks Has Established Irreparable Harm If the Preliminary
            Injunction is Denied ............................................................................... 3

            1.    The Domain Name and Content of Defendants' Website
                  Have A "Tendency to Deceive" Internet Users ............................ 3

            2.    The "Tendency to Deceive" Arises from Defendants' Use
                  of the Dominant Portion of Fairbanks' Mark .............................. 6

            3.    The Timing of the Preliminary Injunction Motion Does Not
                  Diminish the Irreparable Harm Suffered by Fairbanks ................ 8

      B.    Defendants Have Not Shown Any Harm if the Preliminary
            Injunction Is Granted ........................................................................... 10

      C.    Fairbanks Has Shown A Strong Likelihood of Success on the
            Merits .................................................................................................... 11

            1.    Fairbanks Has Shown That It Will Likely Succeed on Its
                  Claim for False Designation of Origin Under 15 U.S.C. §
                  1125(a) ........................................................................................ 12

                  a.    Defendants Used Fairbanks' Valid Trademark ............... 12

                  b.    Defendants' Use of the Mark Occurred "in
                        Commerce" and "in Connection with the Sale,
                        Offering for Sale, Distribution, or Advertising" of
                        Goods and Services ......................................................... 13

                        (i)    The Website Prevents Customers From
                               Reaching Fairbanks' Official Website ............... 13

                        (ii)   The Website Steers Users to Others
                               Providing Mortgage-Related Services ................ 14

                        (iii)  Kenney Provides a Referral Service to
                               Plaintiffs' Attorneys .......................................... 15

                        (iv)   The $3 Million Demand ...................................... 17

                  c.    Defendants Used the Mark in a Manner Likely to
                        Confuse Customers .......................................................... 18

            2.    Fairbanks Has Shown That It Will Likely Succeed on Its
                  Claim for Violation of the AntiCybersquatting Consumer
                  Protection Act .......................................................................... 18

      D.    The Issuance of a Preliminary Injunction is in the Public Interest .......... 24

Conclusion ................................................................................................................ 25

TABLE OF AUTHORITIES

CASES

Page(s)

Adaptive Molecular Technologies, Inc. v. Woodward, WIPO Case
No. D2000-0006 (2000)............................................................................................... 8

Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc., 909 F. Supp. 896
(S.D.N.Y. 1995) ........................................................................................................ 10

Black & Decker v. Pro-Tech Power, Inc., 26 F. Supp. 2d 834 (E.D. Va. 1998) .......................... 4

Blackwelder Furniture v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977) ................ 3, 6, 10, 11, 12

Equine Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542 (1st Cir. 1995)...................23, 24

Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565 (Fed. Cir. 1983)........................... 8

Great Eastern Resort Corp. v. Virtual Resort Solutions, L.L.C., 189 F. Supp. 2d 469
(W.D. Va. 2002)......................................................................................................... 10

Green Prods. Co. v. Independence Corn By-Products Co., 992 F. Supp. 1070
(N.D. Iowa 1997).......................................................................................................... 24

Harrods Ltd. v. Sixty Internet Domain Names, 157 F. Supp. 2d 658 (E.D. Va. 2001)................ 23

JTH Tax, Inc. v. H & R Block Eastern Tax Servs., 128 F. Supp. 2d 926 (E.D. Va. 2001)............ 3

Jews for Jesus v. Brodsky, 993 F. Supp. 282 (D.N.J. 1998)........................................................ 11

King v. Innovation Books, 976 F.2d 824 (2d Cir. 1992)................................................................ 9

Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111 (7th Cir. 1997) .............. 7

Opticians Ass'n of Am v. Independent Opticians of Am., 920 F.2d 187 (3d Cir. 1990) ............. 11

Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641 (3d Cir. 1958) ................................ 3

People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359
(4th Cir. 2001)....................................................................................................5, 10, 12, 13

Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353 (4th Cir. 1991)................................. 3, 11

Scotch Whiskey Ass'n v. Majestic Distilling Co., 958 F.2d 594 (4th Cir. 1992) ....................... 24

TABLE OF AUTHORITIES
(Continued)

Page(s)

Shields v. Zuccarini, 254 F.3d 476 (3d Cir. 2001) ..................................................... 24

Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489 (2d Cir. 2000) .......................... 24

Studio 1712, Inc. v. Etna Products Co., 777 F. Supp. 844 (D. Co. 1991) ..................................... 9

Sunquest Information Systems, Inc. v. Park City Solutions, Inc., 130 F. Supp. 2d 680
(W.D. Pa. 2000).................................................................................................... 9-10

Tom Doherty Assoc's, Inc. v. Saban Entertainment, Inc., 60 F.3d 27 (2d Cir. 1995)................... 9

United Indus. Corp. v. Clorox Co., 140 F.3d 1175 (8th Cir. 1998) .......................................... 3, 4

Wynn Oil Co. v. American Way Service Corp., 943 F.2d 595 (6th Cir. 1991).....................3, 4, 6

Ziegenfelder Co. v. Dunkirk Ice Cream Co., 1993 U.S. Dist. LEXIS 20742
(N.D. W.Va. 1993) ..................................................................................................... 9

RULE AND STATUTES

15 U.S.C. § 1114 ....................................................................................................... 12

15 U.S.C. § 1115(a) ................................................................................................... 23

15 U.S.C. § 1125(a)................................................................................................... 12

15 U.S.C. § 1125(c)(1)(F)........................................................................................... 23

15 U.S.C. § 1125(d)(1) ............................................................................................... 18

OTHER AUTHORITY

Jerome Gilson, TRADEMARK PROTECTION AND PRACTICE, Vol. 2, § 5.03 (2002 ed.).................... 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Northern Division

FAIRBANKS CAPITAL CORP.,           )
                                   )
            Plaintiff,             )
                                   )
v.                                 )          Civil Action No. AMD02CV2587
                                   )
W. CRAIG KENNEY, et al.,           )
                                   )
            Defendants.            )

PLAINTIFF'S POST-HEARING BRIEF IN SUPPORT
OF MOTIONS FOR PRELIMINARY INJUNCTION

INTRODUCTION

At the preliminary injunction hearing on February 28, 2003, plaintiff Fairbanks Capital

Corporation ("Fairbanks") presented evidence in support of its motion for a preliminary

injunction enjoining defendants W. Craig Kenney and Brian Barr from improperly using the

trademark "Fairbanks" in connection with their website, "www.conti-fairbanks.com," in

violation of both the Anti-cybersquatting Consumer Protection Act ("ACPA") and the Lanham

Act.[1]  Fairbanks presented incontrovertible evidence of the inherent confusion caused by the

domain name of defendants' website and the URL addresses that redirect users to the website, as

well as the confusion caused by the content of the website.  Fairbanks also showed that it would

likely succeed on the merits of its claims – including the claim under the ACPA, where

Fairbanks showed that Kenney's demand for money in return for shutting down his website

---

[1]  These statutes provide the basis for Fairbanks' claims in Counts I and II of the Amended
Complaint.

constituted the bad-faith intent to profit required under the statute.  Fairbanks further showed it is

in the public interest for the Court to protect Fairbanks' trademark rights.

Defendants, on the other hand, have not demonstrated a basis for disputing the confusion

and have presented no evidence of any harm they would suffer if the injunction is entered.  Barr

submitted no written opposition to the motion and did not present any evidence in his defense at

the hearing opposing entry of the preliminary injunction.[2]  Kenney submitted eight exhibits—

two of which have nothing to do with the website—and read deposition testimony given by a

Fairbanks employee.  Neither the exhibits nor the deposition testimony related to any harm that

defendants would suffer if enjoined from using the Fairbanks mark on the website.  Indeed, the

evidence showed that Kenney, in anticipation of being ordered to cease and desist using the

Fairbanks mark, already has begun advising his website visitors to use the domain name

"www.servicingnews.com" instead of "www.conti-fairbanks.com."

Fairbanks has established that the website has a "tendency to deceive" internet users,

defendants will not be harmed by an injunction, Fairbanks will likely succeed on the merits, and

the public interest is served by entry of the injunction.  The balance of factors clearly show that

while Fairbanks is being harmed by the infringement of its trademark and the cybersquatting,

there is no evidence of record showing any harm to the defendants if an injunction is issued.  The

Court should enter the preliminary injunction.

---

[2]  Under Rule 105(2) of the Rules of this Court, Barr's opposition to Fairbanks' motion for
preliminary injunction was due by January 3, 2003 (Fairbanks served its motion on Barr by mail
on December 17, 2002.)  Barr has thus waived any opposition to the motion both legally and
practically, having submitted no evidence or argument at the hearing.

I.    THE COURT SHOULD ENTER A PRELIMINARY INJUNCTION ENJOINING
      DEFENDANTS' INFRINGEMENT OF FAIRBANKS' MARK

        In the Fourth Circuit, the standard for entering a preliminary injunction requires the Court

to consider the four factors first laid out in Blackwelder Furniture v. Seilig Mfg. Co., 550 F.2d

189 (4th Cir. 1977):

        (1)    the likelihood of irreparable harm to the plaintiff if the preliminary injunction is
               denied,

        (2)    the likelihood of harm to the defendant if the requested relief is granted,

        (3)    the likelihood that the plaintiff will succeed on the merits, and

        (4)    the public interest.

See also Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991) (internal

citation omitted).

        A.    Fairbanks Has Established Irreparable Harm If the Preliminary Injunction
              is Denied

              1.    The Domain Name and Content of Defendants' Website Have A
                    "Tendency to Deceive" Internet Users

        Courts have found that a mere "tendency to deceive" satisfies the showing of irreparable

harm required for a preliminary injunction under the Lanham Act.  See United Indus. Corp. v.

Clorox Co., 140 F.3d 1175, 1183 (8th Cir. 1998) ("finding of a tendency to deceive satisfies the

requisite showing of irreparable harm"); Wynn Oil Co. v. American Way Service Corp., 943

F.2d 595, 608 (6th Cir. 1991) ("'finding of irreparable injury ordinarily follows when a

likelihood of confusion or possible risk to reputation appears'") (internal citations omitted);

Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 649 (3d Cir. 1958) (only "tendency

to deceive" required).  Courts in the Fourth Circuit have followed this general rule.  See JTH

Tax, Inc. v. H & R Block Eastern Tax Servs., 128 F. Supp. 2d 926, 948 (E.D. Va. 2001)

("'finding of a tendency to deceive satisfied the requisite showing of irreparable harm'")

(quoting <u>United Indus. Corp.</u>); <u>Black & Decker v. Pro-Tech Power, Inc.</u>, 26 F. Supp. 2d 834, 862 (E.D. Va. 1998) (demonstration of tendency to mislead satisfies irreparable harm requirement). As the Sixth Circuit explained, "[t]he irreparable harm flows 'both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values.'" <u>Wynn Oil Co.</u>, 943 F.2d at 608.

Kenney's website clearly has a "tendency to deceive" Fairbanks' business associates and actual and potential customers by virtue of its improper use of the Fairbanks trademark and the misleading content in Kenney's website. Kenney has admitted registering the following URL addresses containing Fairbanks' mark:

www.conti-fairbanks.com (registered April 2001)

www.fairbankscapital.net (registered Nov. 2001)

www.boa-fairbanks.com (registered Nov. 2001)

www.fairbankscomplaint.com (registered Nov. 2001)

www.bankofamericafairbanks.com (registered Nov. 2001)

www.citi-fairbanks.com (registered Nov. 2001)

www.fairbankscapitalcomplaint.com (registered Nov. 2001)

www.equicreditfairbanks.com (registered January-February 2002)

Deposition of W. Craig Kenney (1/9/03) at 23-26 (hereafter "Kenney Dep. at __"); Pl. Exhibit 3 (Network Solutions Renewal Form Printout). These URL addresses all redirect the internet user to www.conti-fairbanks.com.[3] Kenney Dep. at 67 ("Q: Now, one of the things that these URLs enable you to do is to redirect people who use the various URLs to conti-fairbanks.com, right?

---

[3] Kenney has apparently "de-activated" URL "www.fairbankscapital.net" though it is still registered to Kenney. <u>See</u> Pl. Exhibit 3.

A: Yes"). Many of the URL addresses combine the Fairbanks mark with the name of other companies associated with Fairbanks. Kenney's use of these domain names immediately and intentionally portrays a non-existent relationship between Kenney's website and Fairbanks that confuses users and ultimately deters them from reaching Fairbanks' own website. Kenney's misleading domain names by themselves thus create a likelihood of confusion and exhibit a "tendency to deceive." People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 366-67 (4th Cir. 2001) (finding use of plaintiff's mark in domain name of otherwise non-confusing web page created likelihood of confusion). Indeed, Kenney himself has admitted that users have come to his website "by accident."

> Q. Have you ever been contacted by anybody who was trying to contact Fairbanks Capital Corporation?
>
> A. … I would estimate, and this is only a rough estimate, that there's probably been 25, 20 to 25 people that have landed at my site by accident…

Kenney Dep. at 100-01. Kenney's use of Fairbanks' mark in "meta tags" and page titles also confuses actual and potential Fairbanks customers. Id. at 94-95; Pl. Exhibit 25 (identifying "Fairbanks Capital," "Foreclosure," and "Fairbanks" as meta tags in Kenney's website).

Distinct from the confusion caused by the URL's themselves, the content of Kenney's website also has a "tendency to deceive" Fairbanks' customers and business associates. An Internet user entering www.conti-fairbanks.com is greeted in very large typeface by the message "Welcome to the Fairbanks Resource Site." As the Court has noted, there is nothing on the top part of the home page – the first screen that visitors to the website will see – that informs or otherwise suggests to the visitor that this is not a website affiliated with Fairbanks.

In addition, the Kenney website demonstrates a "tendency to deceive" through the contact information listed on the website. The "Contact Us" link provides a mailing address of

5

"Conti-Fairbanks.com, P.O. Box 925, Glencoe, Maryland, 21152," an email address of "info@conti-fairbanks.com," a telephone number and a fax number. None of this contact information dispels the confusion about whether the website is affiliated with Fairbanks. In fact, the contact information exacerbates the confusion and could seriously mislead an Internet user who is only searching for Fairbanks' actual address.

Kenney, on the other hand, presented no evidence that his website was not confusing. His six exhibits of search engine results show only that when using selected engines with the words "Fairbanks" or "Fairbanks Capital" alone, defendants' website will not be one of the top selections. In contrast, Fairbanks presented evidence of search engine results that showed when "Fairbanks" was combined with another term, such as "Conti" or "mortgage," defendants' website ranked among the top returns. Thus, the fact that some searches do not list defendants' website near the top does not disprove that the URL is confusing. Kenney did not and could not point to any evidence that showed the web address or the content of the first page of the website was not confusing.

Because of the confusion created by Kenney's multiple deceptive uses of Fairbanks' mark, there is a presumption of irreparable harm to Fairbanks. See Wynn Oil Co., 943 F.2d at 608. Accordingly, Fairbanks easily satisfies the irreparable harm prong of the Blackwelder test.

 2. The "Tendency to Deceive" Arises from Defendants' Use of the Dominant Portion of Fairbanks' Mark

Remarkably, Kenney argues that there is no infringement because Kenney does not use Fairbanks' owl logo on his website. The Court recognized, however, that this is simply untrue— the first page of the website prominently displays Fairbanks' owl logo with the word "Fairbanks" emblazoned over it. In any event, because the word "Fairbanks" is the dominant portion of

Fairbanks' registered trademark, the Court need not decide whether Kenney misuses Fairbanks'
owl logo.

It is "well established that one word or other feature of a composite trademark may be
considered the salient feature and be given greater weight than the surrounding elements" in a
likelihood of confusion analysis.[4]  Jerome Gilson, TRADEMARK PROTECTION AND PRACTICE, Vol.
2, § 5.03 (2002 ed.).  Here, the word "Fairbanks" is clearly the salient feature.  When searching
for Fairbanks on the internet, a user would not (and could not) type in the Fairbanks owl logo.
Moreover, in the loan servicing industry, plaintiff is well known as and has built extensive
goodwill as "Fairbanks."  Pl. Exhibit 22 (Harmer Decl. (11/22/02) at ¶¶ 3-7).

Many courts, confronted with analogous situations, have determined the words to be the
dominant portion of a trademark.  For instance, in Meridian Mutual Ins. Co. v. Meridian Ins.
Group, Inc., 128 F.3d 1111 (7th Cir. 1997), the Seventh Circuit was presented with two
companies in the insurance business who had similar marks, but their designs differed.  The
Seventh Circuit found it significant that "both companies were using the salient word . . . in the
insurance industry," and then overturned the district court's determination that the differences in
the logos distinguished the plaintiff and defendants' names, because the plaintiff's mark

> is likely to be used in a vocal sense, through telephone calls either
> initiated by one of the parties or by their respective clients.  Any
> visual distinctions between the parties' use of "Meridian" are
> irrelevant. . . . . A person hearing the two parties' names would
> likely focus on the word "Meridian" and gloss over the other
> words, and the parties are therefore using essentially the same
> mark.

---

[4] Fairbanks registered what is known as a "composite" trademark, i.e., a trademark that has
component parts.  As the coding for the trademark itself notes, Fairbanks registered its owl
"design, plus words, letters, and/or numbers."  See Pl. Exhibit 1.

Id. at 1116 (emphasis added).  See also Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d

1565, 1570 (Fed. Cir. 1983) (dominant portion of Giant Food logo and Giant Hamburgers logo is

the word "giant," in part because "[f]rom a distance, both marks reveal a word written across a

circular or oval-shaped object").

  In Adaptive Molecular Technologies, Inc. v. Woodward, WIPO Case No. D2000-0006

(2000), which was decided by the Administrative Panel of the WIPO Domain Name Arbitration

and Mediation Center, the complainant owned a trademarked logo which included a "design of

three circles and adjoining lines" and the product name "MILITEC."  The respondent had

registered the domain name militec.com, and the complainant initiated suit to obtain transfer of

the domain name.  The Panel held that it was "beyond dispute" that complainant had shown

confusing similarity between its trademark and the domain name militec.com, because "the

primary, distinctive element" of the trademarked logo was "MILITEC" and the respondent—just

like Kenney—"referred to the complainant's product by the shorthand 'MILITEC' on the

website."  Id. at 2-3 (emphasis added).  As in Adaptive Molecular Technologies, it is "beyond

dispute" that Kenney is using the Fairbanks mark.  Kenney admitted in his deposition that the

reason he registered his domain names was to invoke Fairbanks, the companies Fairbanks has

business relationships with, and the loan servicing industry.  See Kenney Dep. at 15-16.  The

word "Fairbanks" is clearly the dominant portion of Fairbanks' registered trademark and Kenney

has intentionally sought to take advantage of this fact.

   3. The Timing of the Preliminary Injunction Motion Does Not Diminish the
     Irreparable Harm Suffered by Fairbanks

  Kenney has argued that the timing of Fairbanks' motion for preliminary injunction –

November 2002 – shows that Fairbanks is not being irreparably harmed.  As counsel for

Fairbanks explained, any "delay" in seeking an injunction in this case is fully justified.

Fairbanks moved gingerly before seeking injunctive relief against its customer Kenney. It filed a motion for leave to amend its complaint to seek injunctive relief against Kenney in federal court in Utah in January 2002. Then, Fairbanks retained new counsel to proceed in Maryland after the Utah case was dismissed for lack of personal jurisdiction, and counsel duly and necessarily investigated the case before filing a complaint and motion for preliminary injunction.

Nevertheless, courts have found irreparable harm even when there has been an extended delay in requesting injunctive relief. See, e.g., Tom Doherty Assoc's, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 40 (2d Cir. 1995) (four-month delay does not preclude preliminary injunction because "a delay caused by a plaintiff's good faith efforts to investigate an infringement does not rebut the presumption of irreparable harm"); King v. Innovation Books, 976 F.2d 824, 831 (2d Cir. 1992) (eight-month delay in filing claim does not rebut presumption of irreparable harm because author of book spent time attempting to verify he had a valid claim); Ziegenfelder Co. v. Dunkirk Ice Cream Co., 1993 U.S. Dist. Lexis 20742, at *16 (N.D. W.Va. 1993) (five-month delay does not preclude finding of irreparable harm because "time used to prepare a[n] . . . infringement case has been held not to amount to undue delay"); Studio 1712, Inc. v. Etna Products Co., 777 F. Supp. 844, 953 (D. Co. 1991) (no undue delay in filing motion for preliminary injunction where plaintiff took four months to file lawsuit and another six months to file—for a total of ten months—for preliminary relief because counsel had to investigate so that he "could, within the bounds of Fed. R. Civ. P. 11, file the instant motion").

In one instance, where a plaintiff took over a year to move for a preliminary injunction from the time it first learned of the defendant's infringing use of its mark, the court stated that it should "not punish [the plaintiff] for failing to [ask for preliminary relief] at a time when it had no idea about the scope or severity of [the defendants'] infringement." Sunquest Information

Systems, Inc. v. Park City Solutions, Inc., 130 F. Supp. 2d 680, 698 (W.D. Pa. 2000) ("[O]nce

[the plaintiff] realized that [the defendant] was . . . infringing, it acted as a responsible litigant

should . . . [it] hired lawyers to investigate the matter and advise it on how to proceed.")

(emphasis added).  Since "delay attributable to good faith investigation . . . does not" defeat the

presumption of irreparable injury, Fairbanks did not unduly delay in filing this motion.  Bear

U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc., 909 F. Supp. 896, 909 (S.D.N.Y.

1995).

        Moreover, even if there was unnecessary delay—and again, there was not, as explained

by Fairbanks' counsel at the hearing—that is not dispositive of whether an injunction should

issue.  In the very case relied upon by Kenney, Great Eastern Resort Corp. v. Virtual Resort

Solutions, L.L.C., 189 F. Supp. 2d 469, 475 (W.D. Va. 2002) (referred to as the "Massanutten"

case by opposing counsel), the court entered the preliminary injunction despite a delay of

"several years."  The court held that the delay of several years "weaken[ed] the argument that

[the] harm [was] irreparable," but nevertheless still found that a preliminary injunction was

appropriate because of the plaintiff's "valid, protectable trademark," a "likelihood of public

confusion" under People for the Ethical Treatment of Animals, Inc. v. Doughney, 263 F.3d 359

(4th Cir. 2001), and the public interest in the Lanham Act's enforcement.  Great Eastern Resort

Corp., 189 F. Supp. 2d at 475-76, 479, 481.  Thus, Kenney has not provided any legal basis for

denying the motion for preliminary injunction.

        B.        Defendants Have Not Shown Any Harm if the Preliminary Injunction Is Granted

        The second prong of the Blackwelder test requires the examination of the likelihood of

harm to the defendants if the injunction is granted.  There is no evidence in the record that shows

any potential harm to the defendants if they are enjoined from using the Fairbanks mark in

connection with their website.  Kenney's eight exhibits and the deposition testimony of

10

Fairbanks' corporate designee do not concern harm to Kenney.  Kenney did not testify and presented no witnesses.  Barr did not present any evidence whatsoever.

Moreover, defendants can "hardly claim to be harmed since [they] brought any and all difficulties occasioned by the issuance of an injunction upon [themselves]."  Opticians Ass'n of Am v. Independent Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990); see also Jews for Jesus v. Brodsky, 993 F. Supp. 282, 312 (D.N.J. 1998) (cybersquatter cannot complain of irreparable injury if a preliminary injunction issues because he misappropriated the mark of the plaintiff with full knowledge of the plaintiff's trademark rights).

As Fairbanks explained at the hearing, Fairbanks seeks this injunction merely to stop Kenney's unlawful cybersquatting and trademark infringement.  This motion is not an attempt to censor Kenney's speech, as he alleges, although defendants' website is a vehicle for vitriol and hatred not typically associated with protected free expression.  See www.conti-fairbanks.com/disc15_frm.htm and www.conti-fairbanks.com/editorial_archive.htm (containing editorials and discussion postings calling Fairbanks employees "terrorists," "Aryans," "gypsies," and "gangsters," and threatening violence).  When compared with the irreparable harm that Fairbanks has suffered and continues to suffer from defendants' infringements, the imposition of the injunction on Kenney and Barr is insignificant.  In fact, neither would suffer any harm.  A cursory look at Kenney's website show that he has been advising users to "bookmark" the URL "servicingnews.com" since at least January 2003.

Thus, the balance of the first two Blackwelder factors "tips decidedly" in Fairbanks' favor.  Rum Creek Coal, 926 F.2d at 359.

C.    Fairbanks Has Shown A Strong Likelihood of Success on the Merits

Because the balancing of the first two Blackwelder factors "tips decidedly" in Fairbanks' favor, Fairbanks need only show that it has "raised questions going to the merits so serious,

substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more

deliberate investigation." Blackwelder, 550 F.2d at 195. Although the Court need not find a

likelihood of success on the merits, Fairbanks has shown a strong likelihood of succeeding on the

merits of both Counts I and II of the Amended Complaint.

        1.    Fairbanks Has Shown That It Will Likely Succeed on Its Claim for False
               Designation of Origin Under 15 U.S.C. § 1125(a)

A plaintiff can recover under 15 U.S.C. § 1125(a) if (1) the plaintiff possesses a valid

trademark; (2) the defendant used the mark; (3) that the defendant's use of the mark occurred "in

commerce"; (4) the defendant used the mark "in connection with the sale, offering for sale,

distribution, or advertising" of goods or services; and (5) the defendant used the mark in a way

likely to confuse consumers. People for the Ethical Treatment of Animals v. Doughney, 263

F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114, 1125(a)). There is ample evidence to

support each of these elements.

        a.    Defendants Used Fairbanks' Valid Trademark

Fairbanks easily satisfies the first two elements of this claim. As shown at the hearing,

Fairbanks owns United States Trademark Registration 2,206,930 for the service mark

"FAIRBANKS," which was registered by the United States Patent and Trademark Office on

December 1, 1998. Pl. Exhibit 1. Moreover, Kenney has used the mark by registering URL

addresses containing Fairbanks' mark. Kenney Dep. at 23-26; Pl. Exhibit 3 (Network Solutions

Renewal Form Printout). The URL addresses other than www.conti-fairbanks.com all redirect

the user to www.conti-fairbanks.com.[5] Kenney Dep. at 67 ("Q: Now, one of the things that

these URLs enable you to do is to redirect people who use the various URLs to conti-

---

[5] See footnote 3, supra, regarding www.fairbankscapital.net.

fairbanks.com, right?  A:  Yes").[6]  Defendants have also used the mark in the content of the

website, in the meta tags and in the page titles.  See the homepage of www.conti-fairbanks.com

(welcoming visitors to "The Fairbanks Resource Center").

> b.    Defendants' Use of the Mark Occurred "in Commerce" and "in
>        Connection with the Sale, Offering for Sale, Distribution, or
>        Advertising" of Goods and Services

Defendants have not disputed that their use of the Fairbanks mark in the URL addresses

and domain names constituted use of the mark in commerce.  Kenney has admitted that his

"website's primary activity is with the loan servicing of Fairbanks Capital Corporation."  Kenney

Dep. at 18.  The evidence also shows that the defendants have used Fairbanks mark in

connection with goods and services by (i) preventing customers of Fairbanks from reaching

Fairbanks' official website to use Fairbanks' services; (ii) linking to other websites that provide

mortgage-related services; (iii) by providing an attorney-referral service; (iv) by using the

website in an attempt to obtain payment from Fairbanks.  See People for the Ethical Treatment of

Animals v. Doughney, 263 F.3d 359, 365 (4th Cir. 2001).

> (i)    The Website Prevents Customers From Reaching
>         Fairbanks' Official Website

Under Doughney, to use the plaintiff's mark in "connection with goods or services," a

defendant need not have actually sold or advertised goods or services on the website.  263 F.3d

at 365.  Rather, the defendant need only have prevented users from obtaining or using plaintiff's

goods or services, or need only have connected the website to others' goods or services.  Id.

---

[6]  Moreover, despite Kenney's self-righteous protest that he would not use "fairbankssucks.com"
for his website because it was "demeaning," Kenney also has registered both
"fairbankssucks.com" and "fairbankscapitalsucks.com."  See Exhibit A, attached hereto.  Despite
the decision of the U.S. District Court for the Central District of California suggesting otherwise,
those names infringe on Fairbanks' mark.

Here, Kenney has admitted that the use of the Fairbanks mark in his domain names prevents both

actual and potential Fairbanks customers from reaching Fairbanks' official website.

> Q.     Have you ever been contacted by anybody who was trying to
>         contact Fairbanks Capital Corporation?

> A.     … I would estimate, and this is only a rough estimate, that there's
>        probably been 25, 20 to 25 people that have landed at my site by
>        accident…

Kenney Dep. at 100-01.  Kenney's use of meta tags and page titles also prevents actual and

potential Fairbanks customers from reaching Fairbanks' official website.  Id. at 94-95; Pl.

Exhibit 25 (identifying "Fairbanks Capital," "Foreclosure," and "Fairbanks" as meta tags in

Kenney's website).

> (ii)    The Website Steers Users to Others Providing Mortgage-
>         Related Services

The Kenney website provides links to other websites that provide goods and services.

For example, the Kenney website links directly to www.foreclosures.com, which provides

services.

> Q.     And what has been handed to you now as Exhibit 4 is a printout of
>        a section from the News and Update section dated March 18, 2002
>        called Foreclosure Laws State-by-State, correct?

> A.     Correct.

> Q.     And that has within it a link to foreclosures.com?

> A.     It does.

> Q.     Right?  And that's found on your website?

> A.     That's correct.

Kenney Dep. at 199; see also Pl. Exhibit 20 (showing webpage with link to

www.foreclosures.com).  Other links on the Kenney website include www.amauditing.com,

which provides mortgage-related services, and www.lieffcabraser.com, which is the website for

the California law firm Lieff, Cabraser, Heimann, & Bernstein LLP that specializes in class action lawsuits.  Pl. Exhibit 17 (Posting from Feb. 24. 2003 linking to www.amauditing.com); Pl. Exhibit 26 (identifying external links on Kenney's website).

           (iii)     Kenney Provides a Referral Service to Plaintiffs' Attorneys

Through his website, Kenney provides attorney referral services when he is contacted by users of his website looking for legal assistance.

Q.     So nobody has contacted you looking for a lawyer?

A.     Oh, yes, they will contact looking for a lawyer, yes.  They will ask if I know of any lawyers.  That's a standard, that's a standard question, yes.

Q.     So to the extent that that is, that that person is seeking legal advice in the nature of a referral to a lawyer—

A.     Correct.

Q.     -- that does happen?

A.     That does happen.

Q.     All right.

A.     Yes.

Q.     And have you referred people to lawyers?

A.     Occasionally.  Not always.

\*      \*      \*

Q.     Okay.  To which lawyers have you referred people who have contacted you?

A.     I don't recall.

Q.     You can't recall a single one by name?

A.     Yes, there was one yesterday.  His name was Rubinstein at some place in Virginia.

15

*     *     *

Q.    Have you – can you tell me the name of any other lawyer that you've referred somebody to?

A.    I've referred several to Charlie Griffin, Charles E. Griffin, Jr., in South Carolina; many to Dan Edelman . . . many to Dan Mulligan . . . . They're the ones that I specifically recall. There's been many, many, many others . . .

*     *     *

Q.    And how many people have you referred to Charles Griffin?

A.    Twenty, 25, maybe in the entire course of our relationship.

Q.    How many have you referred to Daniel Edelman?

A.    Twenty, 25 could be as high as 50.

Q.    How many have you referred to Richard Gordon?

A.    Four.

Q.    How many have you referred to Daniel Mulligan?

A.    Six.

Kenney Dep. at 141-44. Kenney has provided attorney referrals to his website users when they provide personal data when filling out "Information Forms" located on the website. Pl. Exhibit 4 (email from Kenney referring "Jacqueline" to attorney Daniel J. Mulligan, Esq.); Pl. Exhibit 31 ("Information Form").

Postings in the News and Update section of the website also provide legal referrals. One posting, entitled "Attorney Network," states "[w]e are currently in discussions with a nationwide network of independent attorneys representing over 56 law firms with more than 70 offices. Many of the attorneys specialize in consumer financial issues." Pl. Exhibit 18. A posting entitled "Legal Services" dated April 1, 2002 provides similar information. Pl. Exhibit 21.

In return, Kenney has received benefits, including at least free or discounted legal services.  See Kenney Dep. at 146 (paying $1 for legal services from Attorney Charles Griffin); Pl. Exhibit 41 (Letter from Michael D. Glenn, Esq. to Mark I. Bailen, Esq., Feb. 12, 2003, stating that Attorney Griffin provided legal work for Kenney over the telephone on several occasions and did not charge for his services).

(iv)    The $3 Million Demand

Kenney's $3 million demand is further evidence that Kenney has used the website in connection with goods and services.  The fact that Kenney even offered to shut down his website in return for payment from Fairbanks supports the theory that Kenney is seeking monetary gain and has a bad faith intent to profit.  The evidence detailing the settlement offer (see Pl. Exhibit 7 (Geesing Decl. at ¶ 11-13), Pl. Exhibit 9 (Letter from Sidle to Geesing, Aug. 1, 2002), and Kenney Dep. at 221) should be admitted as probative to a collateral issue in this case—namely, Kenney's efforts to extract money from Fairbanks through improper use of the Fairbanks trademark.  This evidence also supports Fairbanks' claim under the ACPA.  Indeed, in the typical ACPA case, the defendant would have registered a domain name using a company's name or trademark and then demanded payment to cease operation and turn over the domain name. Kenney is doing essentially the same thing here but in a more devious manner.[7]

---

[7]  Other evidence showing use of the website in connection with goods and services includes Defendant Barr's admission that he has a pecuniary interest in the website.  Pl. Exhibit 6 (Barr's Answer to Amended Complaint (¶ 14) where he admits that he is a "de facto partner" with Kenney and has a "pecuniary interest in the website of an unknown nature"), and the use of the website to solicit funds for the formation of a "legal" team.  See Pl. Exhibit 19 (News and Updates posting stating "we would suggest you contact Peter B. Langbord . . . and discuss financial support issues").

c.      Defendants Used the Mark in a Manner Likely to Confuse
        Customers

As shown above, defendants' use of Fairbanks' mark in domain names of their website has a tendency to deceive before users even reach the website. The content of the website continues to confuse web users even after they have arrived at the site through Fairbanks' registered mark. It is not clear from the first screen of the website that the website is not affiliated with or sponsored by Fairbanks. Pl. Exhibit 24. The website is full of information regarding mortgage-related issues—just as one would expect from the official Fairbanks website. In addition, metatags and page titles embedded in the website put the Kenney site at the top of search engine lists. Pl. Exhibits 32-37; see also Pl. Exhibit 24 (showing homepage title "Conti-Fairbanks Resource Site – Welcome"); Pl. Exhibit 25 (showing source code of Kenney website as including metatag keywords such as "Fairbanks" and "Fairbanks Capital"). Users looking for the official Fairbanks website are likely, therefore, to wind up at Kenney's website. The website's so-called "Mission Statement" does little to dispel this confusion. See Pl. Exhibit 27. Fairbanks, therefore, has shown that defendants used Fairbanks' mark in a manner likely to confuse customers.

Accordingly, Fairbanks has shown that it is likely to succeed on its claim in Count I of the Amended Complaint for false designation of origin.

2.      Fairbanks Has Shown That It Will Likely Succeed on Its Claim for
        Violation of the AntiCybersquatting Consumer Protection Act

Under the ACPA, "a person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person—(i) has a bad faith intent to profit from that mark . . . and (ii) registers, traffics in, or uses a domain name" that is identical or confusingly similar to a distinctive or famous mark. 15 U.S.C. § 1125(d)(1).

As established above, Kenney has registered and used a domain name that is confusingly similar to Fairbanks' registered mark.  As shown below, defendants have exhibited a bad faith intent to profit from that mark.

In determining whether there is bad faith intent to profit under the ACPA, the statute identifies several factors for consideration by the court.  The evidence in this case supports these factors.

> (I)     the trademark or other intellectual property rights of the person, if any, in the domain name;

Kenney has conceded that he has no trademark or intellectual property rights in Fairbanks' mark:

> Q.     Do you have, yourself, do you own any trademarks in any materials containing the name Fairbanks?
>
> A.     No.
>
> Q.     Any copyrights in any materials containing the name Fairbanks?
>
> A.     No.

Kenney Dep. at 60.

> (II)     the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

The defendants' names are William Craig Kenney and Brian Barr, which have nothing to do with Fairbanks' mark or the domain names used by the defendants.

> (III)     the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

Kenney had no prior use of the domain names.  He "launched" the website in April 2001 after Fairbanks had acquired the servicing of Kenney's loan from Conti Mortgage, Inc.  Kenney Dep. at 35.

Q.    And how did you pick that name, conti-fairbanks.com?

A.    Well, my original lender was Conti Mortgage and I'd had
numerous problems with them. And now as I had discovered, not
through any notice I had received from Fairbanks Capital, but I had
discovered obviously that the loans, all of Conti loans were being
serviced by Fairbanks Capital Corporation.

Id. at 39-40. Kenney registered other domain names after learning of the relationship between

Fairbanks and the companies:

Q.    When did you become aware of the business relationship between
Fairbanks Capital and Bank of America?

A.    Somewhere between December of 2001 and January of 2002.

Q.    All right. If you first became aware of that relationship between
December of 2001 and January of 2002, why did you register a
URL with the name Bank of America and Fairbanks in it in
November of 2001.

A.    I don't think I did do it in 2001. I think I did it right after I learned
– I mean I can, I can tell you  this, that I did it after I learned that
there was a relationship between Bank of America and Fairbanks .
. . .

Q.    So the sequence was you learned of the relationship, then you
registered the URL?

A.    Correct . . . .

Id. at 64-65.

(IV)    the person's bona fide noncommercial or fair use of the mark in a site
accessible under the domain name;

The use of links on Kenney's site to other websites that provide goods and services belies

Kenney's claims that his website is for bona fide noncommercial or fair use. See supra, pp. 13-

17. In addition, as shown above, Kenney's attorney referral services further belie his claims of

noncommercial use. Kenney's demand for $3 million to shut down his website is further

evidence of commercial activity. See plaintiff's Hearing Memorandum in Support of the

Admissibility of Defendant W. Craig Kenney's $3 Million Demand to Shut Down His Website (filed on February 27, 2003); Pl. Exhibit 7 (Geesing Decl. at ¶ 11-13);  Pl. Exhibit 9 (Letter from Sidle to Geesing, Aug. 1, 2002); see also Kenney Dep. at 221 ("I plan to continue my advocacy, sir. I decided to put a number on it").

> (V)    the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

Kenney has admitted that his website has diverted users who are trying to locate Fairbanks' online location.

> Q.    Have you ever been contacted by anybody who was trying to contact Fairbanks Capital Corporation?
>
> A.    … I would estimate, and this is only a rough estimate, that there's probably been 25, 20 to 25 people that have landed at my site by accident…

Kenney Dep. at 100-01.  Kenney's use of meta tags also shows his intention to divert consumers searching for Fairbanks' official site. Id. at 94 (Q:  Do you know what meta tags are? A:  Yes. Q.  Do you use those to cause Internet search engines to identify your web site? A: Yes, we do). Kenney includes Fairbanks and Fairbanks Capital, among other terms in his meta tags.  Pl. Exhibit 25.  Kenney's domain names and URL addresses also do not dispel confusion as to the source, sponsorship, affiliation, or endorsement of the Kenney website by Fairbanks.

> (VI)    the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

Kenney offered to shut down his website for $3 million before this case was even filed.  See Pl.

Exhibit 7 (Geesing Decl. at ¶ 11-13).

> (VII)    the person's provision of material and misleading false contact information
> when applying for the registration of the domain name, the person's
> intentional failure to maintain accurate contact information, or the person's
> prior conduct indicating a pattern of such conduct;

and

> (VIII)   the person's registration or acquisition of multiple domain names which
> the person knows are identical or confusingly similar to marks of others
> that are distinctive at the time of registration of such domain names, or
> dilutive of famous marks of others that are famous at the time of
> registration of such domain names, without regard to the goods or services
> of the parties; and

Kenney has registered the following URL addresses: www.conti-fairbanks.com,

(registered April 2001); www.fairbankscapital.net, (registered Nov. 2001); www.boa-

fairbanks.com, (registered Nov. 2001); www.fairbankscomplaint.com, (registered Nov. 2001);

www.bankofamericafairbanks.com (registered Nov. 2001); www.citi-fairbanks.com (registered

Nov. 2001); www.fairbankscapitalcomplaint.com. (registered Nov. 2001);

www.equicreditfairbanks.com (registered January-February 2002).  Kenney Dep. at 23-26.

Kenney has conceded that he created these URL addresses because he knew of the business

relationships that Fairbanks has with the companies identified in the URL addresses:

> Q.    When did you become aware of the business relationship between
> Fairbanks Capital and Bank of America?
>
> A.    Somewhere between December of 2001 and January of 2002.
>
> Q.    All right.  If you first became aware of that relationship between
> December of 2001 and January of 2002, why did you register a
> URL with the name Bank of America and Fairbanks in it in
> November of 2001.
>
> A.    I don't think I did do it in 2001.  I think I did it right after I learned
> – I mean I can, I can tell you  this, that I did it after I learned that

there was a relationship between Bank of America and Fairbanks .
. . .

Q.      So the sequence was you learned of the relationship, then you
        registered the URL?

A.      Correct . . . .

Kenney Dep. at 64-65.  See also footnote 6, supra, regarding "fairbankssucks.com" and

"fairbankscapitalsucks.com."

> (IX)   the extent to which the mark incorporated in the person's domain name
>         registration is or is not distinctive and famous within the meaning of
>         subsection (c)(1) of this section.

In determining distinctiveness of a mark, the Court may consider the "degree of

recognition of the mark in the trading areas and channels of trade used by the marks' owner and

the person against whom the injunction is sought."  15 U.S.C. § 1125(c)(1)(F).  As Fairbanks'

Executive Vice President has stated, "Fairbanks is a recognized industry leader in its field,

having received top ratings from Standard & Poor's, Fitch, Moody's, Fannie Mae, Freddie Mac,

and the U.S. Department of Housing and Urban Development."  Pl. Exhibit 22 (Harmer Decl.

(Nov. 22, 2002) at ¶ 4).  In addition "[s]ince 1989, Fairbanks has established a first-rate

reputation as a leading servicer of underperforming loans."  Id.  See § 15 U.S.C. 1115(a);

Harrods Ltd. v. Sixty Internet Domain Names, 157 F. Supp. 2d 658, 668 (E.D. Va. 2001)

(plaintiff's presentation of "incontestable federal trademark registrations" issued before the

domain names were registered "creates a presumption that its mark is inherently distinctive");

Equine Technologies, Inc. v. Equitechnology, Inc. 68 F.3d 542, 544-45 (1st Cir. 1995) (noting

that registration of trademark under section 1115(a) "entitles the plaintiff to a presumption that

its registered trademark is inherently distinctive, as opposed to merely descriptive"); see also

Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 497 (2d Cir. 2000) (same; citing

Equine Technologies)

In addition, Fairbanks' own website receives over 100,000 visits a month, bringing it

wide publicity.  See Deposition of David Sewell (2/7/03) Tr. at 22-24 ("Q. … Do you know

approximately how many borrowers use the [Fairbanks] Web page to access information about

their loans? …  A.  In the month of January, we had approximately 108,000 hits").  See Shields

v. Zuccarini, 254 F.3d 476, 482-83 (3d Cir. 2001) ("Joe Cartoon" website receiving in excess of

700,000 visits per month brought it "wide publicity" and merited a determination that

"joecartoon.com" was not only distinctive, but famous); see also Sporty's Farm L.L.C., 202 F.3d

at 497 & n.2 ("ACPA provides protection not only to famous marks but also to distinctive marks

regardless of fame," and finding "sporty's, as used in connection with Sportsman's catalogue of

merchandise and advertising, [to be] inherently distinctive").

     D.     The Issuance of a Preliminary Injunction is in the Public Interest

Finally, a preliminary injunction to enjoin defendants' unlawful use of Fairbanks'

trademarks would be in the public interest. "Deliberate and flagrant infringement of trademarks

should particularly be discouraged in view of the public interest in the integrity of marks as a

measure of quality of products." Scotch Whiskey Ass'n v. Majestic Distilling Co., 958 F.2d 594,

599 (4th Cir. 1992).  As discussed above, Kenney's multiple infringing domain names and the

content of the website confuses the public as to whether or not his website is affiliated with

Fairbanks and likely diverts many Internet users from their intended online destination.  As one

court has noted, "ordinary internet users do not undergo a highly sophisticated analysis when

searching for domain names."  Green Prods. Co. v. Independence Corn By-Products Co., 992 F.

Supp. 1070, 1079 (N.D. Iowa 1997).  Moreover, Fairbanks is not challenging, in the context of

this Motion, any legitimate content contained on Kenney's website.  Fairbanks' objections to the

actual content of Kenney's site are the subject of other actual and prospective claims. Thus, a preliminary injunction is in the public interest.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should enter a preliminary injunction enjoining the defendant from (1) using the domain name www.conti-fairbanks.com, www.fairbankscapital.net, www.boa-fairbanks.com, www.fairbankscomplaint.com, www.bankofamericafairbanks.com, www.citi-fairbanks.com, www.fairbankscapitalcomplaint.com, www.equicreditfairbanks.com; www.fairbankssucks.com; www.fairbankscapitalsucks.com and any other domain names that contain the Fairbanks mark; (2) using any post office addresses that contain Fairbanks' mark; (3) using Fairbanks' mark in meta tags and page titles; and (4) infringing Fairbanks' mark in any other manner. The Court also should order defendants to transfer all right, title, and interest in the domain names and URLs identified in this paragraph.

Respectfully submitted,

BAKER & HOSTETLER LLP


Dated: March 17, 2003              By:_____/s/ Mark I. Bailen_____
                                         Frederick W. Chockley (Bar #04278)
                                         Gary Rinkerman
                                         Mark I. Bailen (Bar #13805)
                                         1050 Connecticut Avenue, NW, Suite 1100
                                         Washington, DC  20036
                                         (202) 861-1680
                                         (202) 861-1783 (Fax)

                                         Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Northern Division

| | | |
|---|---|---|
| FAIRBANKS CAPITAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. AMD02CV2587 |
| | ) | |
| W. CRAIG KENNEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2003 a copy of Plaintiff's Post-Hearing Brief in

Support of Motions for Preliminary Injunction which was electronically filed in this case on

March 17, 2003, was mailed via first class mail, postage prepaid, to:

    Peter B. Langbord
    Lynberg and Watkins
    888 S. Figueroa St., 16th Fl.
    Los Angeles, CA  90017

                BAKER & HOSTETLER, LLP


                By:_____/s/ Mark I. Bailen_____
                    Frederick W. Chockley (#04278)
                    Gary Rinkerman
                    Mark I. Bailen (#13805)
                    1050 Connecticut Ave., N.W., Suite 1100
                    Washington, D.C.  20036
                    (202) 861-1680
                    (202) 861-1783 (Fax)

                Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FAIRBANKS CAPITAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. AMD 02CV2587 |
| | ) | |
| W. CRAIG KENNEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PRELIMINARY INJUNCTION ORDER

Upon consideration of the motions for preliminary injunction, the memoranda of points and authorities in support thereof, the opposition thereto by defendant Kenney, defendant Barr having submitted no opposition, the Hearing Memorandum in Support of the Admissibility of Defendant Kenney's $3 Million Demand to Shut Down His Website, the Hearing Memorandum in Support of the Motion for Preliminary Injunction, and the post-hearing briefs and any responses thereto, the evidence submitted at the preliminary injunction hearing on February 28, 2003, the record herein, and argument from counsel, the Court having found that plaintiff will be irreparably harmed by defendants' continued use of plaintiff's mark FAIRBANKS, it is this ___ of April, 2003,

ORDERED, that plaintiff's motion for preliminary injunction be, and it is hereby, granted; and it is further

ORDERED, that defendants, their agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise are hereby enjoined, and shall cease and desist, from using the mark "FAIRBANKS":

1.       In any URL (Uniform Resource Locator) including but not limited to the

following URL's:

         a.    www.conti-fairbanks.com
         b.    www.fairbankscapital.net
         c.    www.boa-fairbanks.com
         d.    www.fairbankscomplaint.com
         e.    www.bankofamericafairbanks.com
         f.    www.fairbankscapitalcomplaint.com
         g.    www.equicreditfairbanks.com
         h.    www.fairbankssucks.com
         i.    www.fairbankscapitalsucks.com;

2.       In any metadata or meta tags (which are coding statements in the Hypertext

Markup Language (HTML) that describe some aspect of the contents of a web page) on the

website operated by defendants with the URL, www.conti-fairbanks.com ("the Website") or any

other website they maintain or operate including but not limited to the following meta tags:

         a.    Fairbanks
         b.    Fairbanks Capital
         c.    Fairbanks Capital Corp.;

3.       In any web page titles (which are meta tags) on any web pages on the Website or

any other website they maintain or operate, including but not limited to the following web page

titles:

         a.    http://www.conti-fairbanks.com/
         b.    http://www.conti-fairbanks.com/News_Updates.htm
         c.    http://www.conti-fairbanks.com/disc18_frm.htm;

4.       In the name on the homepage of the Website, including but not limited to

"Fairbanks Resource Site;"

5.       In the mailing address of the Website, "CONTI-FAIRBANKS.COM," P.O. Box

925, Glencoe, Maryland 21152;

2

6.      In any other manner, not specified above, that is likely to be confusing to the public, including but not limited to users of the internet; and it is further

ORDERED, that defendants transfer all right, title and interest in the URLs and domain names identified in paragraph one, above, to Fairbanks Capital Corporation.


_____

Hon. Andre M. Davis
United States District Judge