8 of 9 DOCUMENTS

WIPO Arbitration and Mediation Center

NOTICE: Administrative Panel Decisions originally provided by the Secretariat of WIPO. The Secretariat of WIPO assumes no liability or responsibility with regard to the transformation of this data.

Diageo plc v. John Zuccarini, Individually and t/a Cupcake Patrol

Case No. D2000 - 0996

WIPO Arbitration and Mediation Center ADMINISTRATIVE PANEL DECISION

*2000 UDRP LEXIS 752*

October 22, 2000

OPINIONBY: James Bridgeman, Sole Panelist

OPINION:

**[*1] 1. The Parties**

The Complainant is Diageo plc (formerly known as Guinness plc), a corporation organized and existing under the laws of the United Kingdom, with its principal place of business located at 8 Henrietta Place, London W1M 9AG, United Kingdom.

The Respondent is John Zuccarini who is the administrative, technical and zone contact for the domain names in dispute and who the Complainant alleges it the true owner of the said domain names which have been registered in the name Cupcake Patrol, located at Country Walk, 957 Bristol Pike, Suite D-6, Andalusia, Pennsylvania 19020, U.S.A.

**2. The Domain Names and Registrar**

The domain names in issue in this proceeding are www.guinness-really-sucks.com; www.guinness-really-really-sucks.com; www.guinness-beer-really-sucks.com; www.guinness-beer-really-really-sucks.com; www.guinness-sucks.com; www.guinnessreallysucks.com; www.guinnessreallyreallysucks.com; www.guinnessbeerreallysucks.com; www.guinnessbeerreallyreallysucks.com; www.guinness-beer-sucks.com; and www.guinnessbeersucks.com ("said domain names"). CORE Internet Council of Registrars ("CORE") is the Registrar of each of the said domain names.

**3. Procedural History**

**[*2]** On August 10, 2000 the Complaint was received by the WIPO Arbitration and Mediation Center ("the Center") by e-mail and in hard copy on August 11, 2000. The appropriate fees were paid by the Complainant.

On August 15, 2000 the Center sent a Request for Registrar Verification to the Registrar and on August 23, 2000 the Registrar responded, stating that it had not received the Complaint from the Respondent, confirming that it is the registrar of the said domain names, that the Cupcake Patrol is the current registrant of the said domain names, that the Respondent is the Administrative contact, Technical contact and Zone contact, that the Policy applies to the said registrations and that the said registrations had an active ("production") *status* at that time.

In accordance with Paragraph 4(a) of the Rules for Uniform Domain Name Dispute Resolution Policy ("the Rules") and paragraph 5 of the WIPO Supplemental Rules for Uniform Dispute Resolution Policy ("the Supplemental Rules") the Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy ("the Policy"), the Rules and the Supplemental Rules and that payment in the required **[*3]** amount had been made by the Complainant.

On August 25, 2000 the Center sent a Notification of Complaint and Commencement of Administrative Proceedings to the Respondent. Said Notification was sent to the Respondent by Post/Courier, by facsimile and by e-mail. A copy of said Notification was sent to the authorised representative of the Complainant by e-mail. Further copies of said

Notification were sent to the Internet Corporation for Assigned Names and Numbers ("ICANN") and to the Registrar (without enclosures).

Said Notification of Complaint and Commencement of Administrative Proceeding *inter alia* advised the Respondent that the Administrative Proceeding had commenced on August 25, 2000 and that the Respondent was required to submit a Response to the Center on or before September 13, 2000.

No Response was received by the Center from the Respondent and on September 25, 2000, the Center sent a Notification of Respondent Default to the Respondent by post/courier and by e-mail. A copy of said Notification of Respondent Default was on the same date sent to the authorised representative of the Complainant by e-mail. Said Notification *inter alia* advised the Respondent that the **[*4]** Respondent was in default and that in accordance with the Rules, and the Supplemental Rules, the Center would proceed to appoint a single member Administrative Panel as designated by the Complainant, that the said Administrative Panel would be informed of the said default, and that the Center would continue to send all case-related communications to the Respondent.

On October 2, 2000 the Center invited James Bridgeman to act as Administrative Panel in this Administrative Proceeding, and, after having received a Statement of Acceptance and Declaration of Impartiality from him in accordance with paragraph 7 of the Rules, the Center proceeded to appoint said James Bridgeman as Administrative Panel on October 6, 2000. On the same day the case file was transmitted to the Administrative Panel.

In the view of the Administrative Panel, proper procedures were followed and this Administrative Panel was properly constituted.

**4. Factual Background**

The Complainant and its predecessors in business have sold alcoholic beverages products under the <GUINNESS> trademark for many years, commencing in Ireland as early as January 1764. In the course of this business, the predecessor of the Complainant **[*5]** has exported lager and pilsner beer, stout, porter, and ale products around the world since the 1800's. Over the years, through continuous sales, and extensive advertising and promotion, <GUINNESS> brand lager and pilsner beer, stout, porter, and ale products have become some of the world's most famous and best-selling alcoholic beverages. At the present time, the Complainant's <GUINNESS> brand products are sold in approximately 150 countries.

The Complainant has spent many millions of dollars promoting and advertising the <GUINNESS> brand in numerous jurisdictions across the world.

The Complainant is the owner of the following trademarks registered in the USA:

<GUINNESS & Design> registration number 1,057,882 registered since February 1, 1977, for the following goods: "Light beverages, incl. stout, porter, ale, etc." in International Class 32:

<GUINNESS> registration number 321,014 registered since January 15, 1935 in International Class 32 for the following goods: "Light beverages, beer.";

<ARTHUR GUINNESS & SON GUINNESS GOLD MASTER BREWERS SINCE 1759 & design> registration number 1,561,254 in International Class 32 for the following goods: "Light beverages, beer.";

<GUINNESS **[*6]** EXTRA STOUT ARTHUR GUINNESS SON & CO. (DUBLIN) LTD & Design> registration number 861,769 registered since December 10, 1968in International Class 32 for the following goods "Light beverages, stout";

<PUB DRAUGHT GUINNESS & Design> registration number 1,969,268, registered since April 23, 1996 in International Class 32 for the following goods: "Light beverages, beer"; and

<GUINNESS STOUT CERVEZA GUINNESS CABEZA DE PERRO PARA SU SATISFACCION COMPLETA PIDA GUINNESS MUCHO MAS QUE UNA CERVEZA & Design> registration number 872,710, registered since July 8, 1969 in International Class 32 for the following goods: "Light Beverages, stout."

The Complainant is also the proprietor of other registered trademarks in various other jurisdictions throughout the world, consisting of the word mark <GUINNESS> or a device mark incorporating the word <GUINNESS>. The Complainant has furnished details of a sample number of these registrations in Europe and North America and in each case the trademarks are registered for use in connection with "Light beverages including stout, porter, ale and lager beer".

As no Response has been filed, there is little information relating to the Respondent. The said domain **[*7]** names were registered in the name of Cupcake Patrol and in the absence of any evidence to the contrary this Administrative Panel accepts the Complainant's submission that this is a trading name of the Respondent.

**5. Parties' Contentions**

A. Complainant

The Complainant submits that the Respondent registered the said domain names after Complainant filed earlier ICANN proceeding entitled Diageo plc v. John Zuccarini, WIPO Case No. D2000-0541 against the Respondent seeking transfer

of the domain name www.guinnes.com. The Complainant submits that the Respondent registered the said domain names to harass the Complainant for enforcing its trademark rights, and to deliberately interfere with and disrupt Complainant's legitimate business activities.

The Complainant submits that the said domain names in issue are virtually identical to or confusingly similar to the Complainant's U.S. Trademark Nos. 1,057,882; 321,014; 1,561,254; 861,769; 1,969,268; and 872,710 (as well as all other trademark registrations owned by Complainant that include or incorporate the term <GUINNESS>) and to the trademark <GUINNESS> in which the Complainant submits it has common law trademark rights. The Complainant **[*8]** states that this is supported by authority cited *infra.*

The Complainant submits that in order to determine the question of whether a domain name is confusingly similar to a trademark, this Administrative Panel should adopt the same approach as the administrative panel in Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, WIPO Case No. D2000-0477 and apply the multi-factor test set forth in the decision of the United States Court of Appeals for the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979).*

The Complainant states that in Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, WIPO Case No. D2000-0477 the administrative panel concluded that the disputed domain names were confusingly similar to the complainant's trademark. In that case, the administrative panel found that two factors were most compelling in the determination that there was a likelihood of confusion between the complainant's trademark and the disputed domain names: (i) the strength of the WALMART trademark; and (ii) the respondent's intent in selecting the domain names.

As regards the Complainant's rights in the said trademarks, **[*9]** it is submitted that the Complainant's rights "are expansive and predate Respondent's June 5, 2000 registration of the said domain names".

The Complainant submits that the <GUINNESS> mark is famous, in part because the mark has been in continuous use for many years and because Complainant engages in extensive advertising of its products, and uses the <GUINNESS> trademark in this regard.

It is further submitted by the Complainant that there is a clear similarity of the mark and the said domain names in their entireties as to appearance, sound, connotation and commercial impression. The first word in each of the said domain names is <GUINNESS> which is identical to Complainant's <GUINNESS> mark. Respondent took Complaint's famous <GUINNESS> trademark and tacked on other words, such as "beer," "really," and "sucks" to form the said domain names.

The Complainant contends that the Respondent has no rights or legitimate interests in respect of the said domain names. In this regard, the Complainant submits that it has not licensed or otherwise permitted the Respondent to use the <GUINNESS> trademark, or any other trademark incorporating the <GUINNESS> mark. The Complainant has not licensed **[*10]** or otherwise permitted the Respondent to apply for or use any domain name consisting of or incorporating the <GUINNESS> mark.

The Complainant submits that the Respondent is not making a legitimate non-commercial or fair use of the said domain names. In support of this claim the Complainant has submitted a print out of the Respondent's www site accessible *via* the www.guinnes.com domain name in which it is alleged that the Respondent has stated that he registered the said domain names because he was angry with the Complainant for filing an ICANN complaint seeking the transfer of the said www.guinnes.com domain name. It is alleged that the Respondent posted the said domain names on his said www site accessible *via* the said www.guinnes.com www site address during the approximate period from June 1 to July 14, 2000. The Complaint states that the said domain names had not been used in connection with active www sites as of the date of filing of the Complaint.

The Complainant states that the Respondent has not ever been commonly known by the domain names at issue, or by the term <GUINNESS>.

The Complainant submits that the domain names in issue were registered and are being used **[*11]** in bad faith by the Respondent.

It is alleged that the Respondent registered the said domain names for retaliatory purposes in direct response to Complainant initiating the above mentioned administrative proceedings against the Respondent regarding the www.guinnes.com domain name. The Complainant has furnished a detailed history of the administrative proceedings relating to the said www.guinnes.com as explanatory background to the instant administrative proceedings.

In support of its argument that the said domain names were registered by the Respondent as a result of the earlier administrative proceedings, the Complainant has submitted a print-out of a page on the Respondent's said www site and alleges the following statement was posted on that www site during the period from June 1 through July 14, 2000:

"I tell you, I was so upset when I got this STUPID ASS LETTER from the GOOFBALL JACKASS LAWYERS at guinness beer, that I went to register the domain name, WWW.GUINNESSSUCKS.COM, but guess what, that domain name is already owned by someone. Guess who. That's right. Guinness beer owns it themselves. I'm glad I'm not the

only one who thinks they suck. THEY THINK THEY SUCK THEMSELVES!! [*12] . . . So anyway I did go and register a few names about guinness beer and pillsbury. Tell me what you think....Coming Soon to a website near you!!"
On the said print-out of the page on the Respondent's www site there is a list of what the Complainant describes as twenty-two (22) "Guinness sucks" and "Pillsbury sucks" domain names allegedly registered by the Respondent in response to the Complainants initiation of the said earlier administrative proceedings.
The Complainant argues that the Respondent admitted on the said www.guinnes.com www page that he registered the said domain names at issue in this proceeding because he was angered by the Complainant's attempt to take the domain name www.guinnes.com away from him. The registration of the said domain names at issue in this proceeding was done in bad faith and not for a legitimate purpose, rather Respondent's intent is to harass the Complainant for its attempts to enforce its trademark rights and to tarnish the <GUINNESS> trademark.
Given the widespread use and notoriety of the Complainant's <GUINNESS> trademark, the Complainant submits that the Respondent must have been aware that in registering the said domain names he was [*13] misappropriating the valuable intellectual property of the Complainant as owner of the <GUINNESS> trademark.
The Complainant argues that if the Respondent were to use the said domain names in connection with active www sites, it is likely that such use would disrupt the Complainant's legitimate business and divert members of the public from the Complainant's www sites. It is further argued by the Complainant that if the Respondent were to use said domain names in connection with active www sites, consumers searching the Internet for the term <GUINNESS> would likely discover any such site established by the Respondent. The Complainant further submits that it would be likely that such consumers would choose to visit the such sites established by the Respondent, if only to satisfy their curiosity as to the content of such sites. Respondent would thus divert potential consumers of Complainant to his www sites by the use of said domain names. The Complainant submits that there is authority that such diversion constitutes a basis for a finding of bad faith under the Policy.
The Complainant submits that the Respondent is a wholesaler of Internet domain names (defined as someone who acquires [*14] multiple domain names with the intent to profit from them). The Respondent has registered approximately 3000 domain names, approximately 1400 of which are registered with the Registrar. In support of this statement, the Complainant has submitted a print-out, running to thirty one pages, of the results of a search which the Complainant caused to be carried out on the Registrar's WHOIS database for domain names with NIC handles allegedly associated with the Respondent.
The Complainant submits that it would be unrealistic to assume, given the approximately 3000 domain name registrations allegedly held by the Respondent (either individually or by entities such as Cupcake City, Cupcake Shows, Cupcakes, Cupcake Party, Cupcake-Patrols, Cupcake Movies, and Cupcake-Show, all of which are controlled by Respondent), that the Respondent could have intended to use all of those domain name registrations in good faith. The Complainant points out that the Respondent is no stranger to ICANN administrative proceedings and has been found on numerous occasions to have been acting in bad faith.
The Complainant submits that there have been at least five ICANN decisions against the Respondent in which [*15] it has been found that he registered and used domain names that are identical or confusingly similar to famous trademarks in bad faith and without a legitimate business purpose *viz.* Hewlett-Packard Company v. Cupcake City, NAF Case No. FA0002000093562; Encyclopedia Britannica, Inc. v. John Zuccarini et al., WIPO Case No. D2000-0330; Hewlett-Packard Company v. John Zuccarini, NAF Case No. FA00040000994454; Bama Rags, Inc. v. John Zuccarini d/b/a Cupcake Confidential, NAF Case No. 0003000094380 and Bama Rags, Inc. v. John Zuccarini, NAF Case No. 0003000094381.
In addition, the Complainant submits that a federal court has issued a preliminary injunction against the Respondent in a suit brought against him under the Anticybersquatting Consumer Protection Act, *15 U.S.C.A. § 1125*(d). See Shields v. Zuccarini, individually and t/a *Cupcake City, 54 U.S.P.Q. 2d 1166, 89 F. Supp. 2d 634 (E.D. Pa. 2000).* The Complainant submits that the said decision should be deemed persuasive in this case.
The Complainant submits that the Shields case is analogous to the facts at hand in that the Respondent [*16] changed the content of his www sites from commercial uses to purported "protest sites" after being served with a complaint by the owner of the trademark that he was infringing. The Court found that "the vast majority of Zuccarini's many websites are not political *fora* but are merely vehicles for him to make money. . . . It strains credulity to believe that he uses 99.9% of his domain names for profit but reserves his Joe Cartoon domains for fair and lawful political speech." *Id.* at 640 (emphasis added by the Complainant in its submission). The Complainant submits that it is relevant that in Shields, the Respondent admitted that he "put up the protest pages . . . just hours after being served with [the plaintiff's] complaint." *Id.* at 640 n.10.
The Complainant further submitted that in Shields, the Court granted a preliminary injunction against the Respondent and found that he registers confusingly similar domain names with a bad faith intent to profit from other entities'

trademarks. The Court found that the Respondent was a wholesaler of Internet domain names (defined as someone who acquires multiple domain names with the intent to profit from them), who owns **[*17]** approximately 3000 domain names, and that many of his sites featured advertisements for other sites and credit card companies where "visitors were trapped or 'mousetrapped' in the sites, unable to exit without clicking on a succession of ads. Zuccarini received between ten and twenty-five cents from the advertisers for every click." *Id.* at 635, 641. The Respondent's "click-based revenue now approaches $ 1 million per year." *Id.* at 640 n.7. In addition, the Complainant states that the Court found that the Respondent's business "depends upon his parasitic use of others' names" and that the Respondent "admitted that he registered [the domain names] because they are confusingly similar to others' famous marks or personal names -- and thus are likely misspellings of those names -- in an effort to divert Internet traffic to his sites." *Id.* at 639-640. The Court further noted that "Zuccarini admits that he is literally in the business of profiting on the public's confusion" and that the Respondent testified before the Court that he "was amazed to learn 'people mistype [sought domain names] as often as they do' and thus variants on actual spellings of likely search names would **[*18]** result in many unintended visitors to Zuccarini's sites." *Id.* at 639, 640 n. 7.

The Complainant further submits that more recently, the Plaintiff in Shields moved for and was awarded statutory damages and attorney's fees against the Respondent in *Shields v. Zuccarini, 2000 WL 1053884* (E.D. Pa. July 18, 2000). The Court noted that "since our entry of the preliminary injunction, Zuccarini has registered hundreds of misspellings of the names of celebrities . . . . He has also registered variations on Survivor, Big Brother, Mission: Impossible, L.L. Bean and even the Pillsbury Doughboy. Clearly, he has not gotten the crystalline message in our March 22 Opinion and June 5 Order." *Id.* at n.2. The Complainant submits that the Court awarded the Plaintiff statutory damages of $ 10,000 per infringing domain name and, based upon the "egregiousness of Zuccarini's conduct and his complete lack of contrition" the Court found that the case was "exceptional" and therefore found the Plaintiff entitled to an award of counsel fees. *Id.* at 1-2. The Court noted that on June 5, 2000, it granted Plaintiff's (unopposed) motion for summary judgment, holding **[*19]** that Zuccarini had registered the five domain names at issue "willfully, in bad faith, and in violation of the ACPA . . . ." *Id.* at 1.

The Complainant submits that the Administrative Panel would be entitled, under the circumstances, to draw the same inferences from Respondent's registration of a domain name that features Complainant's famous trademark, as that drawn by the Administrative Panel in Hewlett-Packard Company v. Cupcake City (NAF Case No. FA0002000093562).

The Complainant submits that the recent decision in Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, WIPO Case No. D2000-0477 should be deemed persuasive authority as the facts in that case were similar to the facts in the present Administrative Proceedings. In that case, the Respondent had incorporated the word "sucks" in domain names which were, in the absence of that word, confusingly similar to Complainant's mark.

Therefore, upon consideration of all the facts and circumstances, the Complainant submits that the domain names in issue were registered and are being used in bad faith.

B. Respondent

The Respondent did not file any Response.

**6. Discussion and Findings**

**Preliminary Issue**

**[*20]** In the view of this Administrative Panel, the Complainant has established that the Respondent is the regisrant of the said domain names and that he has registered same under a business name or alias.

**Substantive Issues**

Paragraph 4(a) of the Policy places on the Complainant the *onus* of proving in respect of each of the domain names in dispute that:-

(i) the said domain name in dispute is identical or confusingly similar to a trademark or service mark in which the Complainant has rights; and

(ii) the Respondent has no rights or legitimate interests in respect of the said domain name; and

(iii) the said domain name has been registered and is being used in bad faith.

In order to succeed in its application, the Complainant is obliged to satisfy each of the three elements in the test.

As to the first element of the test in paragraph 4(a)(i) of the Policy, this Administrative Panel has considered the Complainant's submissions that the said domain names in issue are virtually identical to or confusingly similar to the Complainant's U.S. Trademark Nos. 1,057,882; 321,014; 1,561,254; 861,769; 1,969,268; and 872,710 (as well as all other trademark registrations owned by Complainant **[*21]** that include or incorporate the term <GUINNESS>) and to the trademark <GUINNESS> in which the Complainant submits it has common law trademark rights.

Since the said domain names and the said trademarks are not identical, this Administrative Panel is required to consider whether the Complainant has established that they, or any of them are confusingly similar.

There remains many questions to be decided in the developing jurisprudence as to the appropriate test that should be applied in deciding the issue of confusing similarity under the Policy. For example in the decision of the administrative panel in Cabela's Incorporated v. Cupcake Patrol NAF FA95080 of 24 July 2000 in directing a transfer of the domain name www.cabelassucks.com, the administrative panel summarised the issue of confusing similarity in the following terms:-

"Courts and other UDRP Panels have recognized that the intentional registration of a domain name while knowing that the second-level domain contains another's valuable trademark weighs in favor of a likelihood of confusion. *See Minnesota Min. and Mfg. Co. v. Taylor, 21 F.Supp.2d 1003, 1005 (D.Minn. 1998); Intermatic Inc. v. Toeppen, 947 F.Supp. 1227, 1235-1236 (N.D.Ill. 1996).*

**[*22]** Courts and UDRP Panels have also addressed the issue of appending the term "-sucks" to another's trademark. *See Lucent Technologies, Inc. v. Lucentsucks.com, 95 F.Supp.2d 528 (E.D. Va. 2000); Bally Total Fitness v. Faber, 29 F.Supp.2d 1161 (C.D. Cal. 1998); Wal-mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico*, D2000-0477 (WIPO July 20, 2000). The Panel does not infer that "-sucks" domain names are immune from scrutiny as being confusingly similar to trademarks to which they are appended. Each case must be considered in light of the facts presented. The Panel in *Wal-mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico* identified that the confusingly similar test may be held to a different standard when used with Internet search engines. *See Wal-mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico*, D2000-0477 (WIPO July 20, 2000).

By using Complainant's marks in its domain names, Respondent makes it likely that Internet users entering "Cabelais" into a search engine will find WWW.CABELASSUCKS.COM in addition to the Complainant's site www.cabelas.com. Respondent's domain name is sufficiently similar **[*23]** to Complainant's marks that the search engine results will confusingly list the Respondent's domain name when searching for Complainant's mark. *See id.*

The Panel concludes that the Respondent's domain name is confusingly similar to the Complainant's marks."

A similar approach had been taken by the adminisrative panelist in EAuto, L.L.C. v. Triple S. Auto Parts d/b/a Kung Fu Yea Enterprises, Inc., (WIPO Case No. D2000-0047, Mar. 24, 2000) where it was proposed that "when a domain name incorporates, in its entirety, a distinctive mark, that creates sufficient similarity between the mark and the domain name to render it confusingly similar". This *formula* was also applied in Wal-Mart Stores, Inc. v. Richard MacLeod d/b/a For Sale (WIPO Case No. D2000-0662, July 14, 2000).

Having considered the caselaw referred to by the Complainant and earlier decisions of administrative panels in ICANN proceedings, this Administrative Panel can see the merit of such a test, since a search of the www against the trademark in such circumstances would inevitably result in the respondent's domain name being generated, if it was being used as an address for an active www site. However **[*24]** in the view of this Administrative Panel, such a test is not sufficient in all circumstances, and particularly it is not sufficient to provide a satisfactory resolution to the question of confusing similarity in cases such as the present.

In the absence of any Response from the Respondent, this Administrative Panel accepts that in the present state of development of the jurisprudence in this area, in cases where the administrative panel is being guided by the principles developing in the laws of the USA, the appropriate test to apply is the multi-factor test set forth in the decision of the United States Court of Appeals for the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979).* In doing so, this Administrative Panel is conscious that this test may not be entirely suited to the determination of these issues as can be seen from the difficulties experienced by this Administrative Panel in its application (infra). Nonetheless it is the test that has been applied in a number of cases where there has been a "-sucks" element. Furthermore, in the present case the Complainant has submitted that this is the appropriate test to apply **[*25]** and the Respondent has made no submissions on the point. In the circumstances, this Administrative Panel with some reservations, accepts that this is the appropriate test to apply.

The multifactor test applied in Sleekcraft was described by the administrative panel in Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, WIPO Case No. D2000-0477 in the following terms:

"The question whether a domain name and a trademark are confusingly similar involves the application of a multifactored test exemplified in the decision of the U.S. Court of Appeals for the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979).* The *Sleekcraft* factors are directed to whether there is a "likelihood of confusion" between two marks. While developed in the context of comparing two trademarks, the *Sleekcraft* factors have more recently been employed by the federal courts to compare domain names to trademarks, and domain names to domain names. The *Sleekcraft* factors were, for example, employed by the federal district court in *Bally Total Fitness* discussed *infra.* The *Sleekcraft* factors were relied upon by the Court **[*26]** of Appeals for the Ninth Circuit in *Brookfield Communications v. West Coast Entertainment, 174 F.3d 1036, 1053-61 (9th Cir. 1999).*

In *Sleekcraft*, the Court of Appeals for the Ninth Circuit enumerated eight factors to be weighed on the question of likelihood of confusion. These are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4)

evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines."

In applying the Sleekcraft test by comparing each domain name with each of the trademarks in issue in these proceedings this Administrative Panel concludes as follows:

(1) As regards the strength of the mark: without doubt, the Complainant is the owner of a very strong and famous trademark viz <**GUINNESS**>.

(2) As to proximity of the goods: this point illustrates the difficulty of slavishly applying a test developed in the context of trademark law to these disputes. The Complainant is a manufacturer and merchant of beers in trademark **[*27]** terms whereas the Respondent, on the evidence before this Administrative Panel is a wholesaler of domain names. However given the history of the relationship between these parties and the fact that the word "beer" is mentioned in a number of the domain name registrations in issue, this Administrative Panel is satisfied that the said domain names directly refer to the Complainant's goods.

(3) As to similarity of the marks: In comparing the marks for similarity, this Administrative Panel has used the *formula* suggested by the Complainant, and compared each in their entireties, as to appearance, sound, connotation and commercial impression. In the absence of any submissions by the Respondent, this Administrative Panel accepts that this is the appropriate approach to take. In applying this *formula,* this Adminsitrative Panel has compared each of the said domain names with each of the Complainant's trademarks and accepts that insofar as each of them include the word "guinness" as the only or first word in the sequence of words, there is certainly a degree of similarity in each case.

(4) As to evidence of actual confusion: the Complainant has not submitted any evidence of confusion, **[*28]** however it is unrealistic to require such evidence, especially in cases such as these where the domain names in issue have not been used as addresses for active www sites.

(5) With regard to the marketing channels used: this issue also illustrates the distinction between trademarks and domain names. This Administrative Panel accepts that a search *via* a www browser against the Complainant's trademark <GUINNESS> will probably generate the domain names in dispute in the list of sites.

(6) As to the type of goods and the degree of care likely to be exercised by the purchaser: What does this mean in the context of a domain name dispute such as the present Administrative Proceeding?

The type of goods which are sold by the Complainant for which it has registered trademarks are alcoholic beverages.

If the Administrative Panel is required to consider in the alternative or in addition, the fact that domain names are essentially addresses for www sites, the question should be posed: who is the purchaser in this context? Is this not the same as asking in the context of the paragraph 4(a)(i) of the Policy, who is the person likely to be confused? The Policy does not assist the Complainant **[*29]** or the Administrative Panel by stating whether the persons in contemplation in the test in paragraph 4(a)(i) are Internet users in general, the "reasonable person", the "reasonable person" using the Internet or some other class of persons. It is hardly likely however that the Policy would be restricted to English speaking persons using the Internet, so there must be some wider group than those who would immediately recognise that the addition of the word "-sucks" to a trademark in which a complainant has rights, would mean that the address is plainly dissociated from that complainant.

The fact that each of the said domain names in issue in these proceedings constitute an abusive, insulting or possibly even defamatory statement would in the view of this Administrative Panel be sufficient to alert most English speaking users of the Internet that the domain name is not the address of a www site associated with the Complainant. This was accepted by the administrative panel in Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico WIPO case D2000-0477, in a similar case, where it was stated:

"Internet users with search engine results listing Respondent's domains are likely **[*30]** to be puzzled or surprised by the coupling of Complainant's mark with the pejorative verb "sucks". Such users, including potential customers of Complainant, are not likely to conclude that Complainant is the sponsor of the identified websites."

In that case however the administrative panel went on to consider the next element of the Sleekcraft test and concluded that:

"it is likely (given the relative ease by which websites can be entered) that such users will choose to visit the sites, if only to satisfy their curiosity. Respondent will have accomplished his objective of diverting potential customers of Complainant to his websites by the use of domain names that are similar to Complainant's trademark."

As the Internet extends far beyond the Anglophone world, a more difficult question arises as to whether non-English speaking users of the Internet would be confused into believing that such a site is owned and/or controlled by the Complainant. Because the word "-sucks" is a slang word with which all English speakers may not be familiar, this Administrative Panel concludes that there may well be circumstances where Internet users are not aware of the abusive connotations **[*31]** of the word and consequently associate the domain name with the owner of the trademark.

The administrative panel in Direct Line Group Ltd, Direct Line Insurance plc, Direct Line Financial Services Ltd, Direct Line Life Insurance Company Ltd, Direct Line Unit Trusts Ltd, Direct Line Group Services Ltd v. Purge I.T., Purge I.T. Ltd (WIPO Case D2000-0583, June 28, 2000) concerning the domain name www.directlinesucks.com stated the position in the following terms:-

"Given the apparent mushrooming of complaints sites identified by reference to the target's name, can it be said that the registration would be recognised as an address plainly dissociated from the Complainants? In the Panel's opinion, this is by no means necessarily so. The first and immediately striking element in the Domain Name is the Complainants' name and adoption of it in the Domain Name is inherently likely to lead some people to believe that the Complainants are connected with it. Some will treat the additional "sucks" as a pejorative exclamation and therefore dissociate it after all from the Complainants; but equally others may be unable to give it any very definite meaning and will be confused about the potential **[*32]** association with the Complainants. The Complainants have accordingly made out the first element in its Complaint (see the rather similar conclusion on this element in Case D 2000-0477 (www.walmartcanadasucks.com))."

The same panelist came to similar conclusions in Dixons Group PLC v. Purge I.T. and Purge I.T. Ltd, D2000-0584 June 28, 2000 in which the domain name in issue was www.dixonssucks.com, in Freeserve PLC v. Purge I.T. and Purge I.T. Ltd, D2000-0585 June 29, 2000 in which the domain name in issue was www.freeservesucks.com and in National Westminster Bank PLC v. Purge I.T. and Purge I.T. Ltd D2000-0636 July 4, 2000, in which the domain name in issue was www.natwestsucks.com

(7) The Defendant's intent in selecting the mark: This Administrative Panel accepts that on the evidence submitted by the Complainant, the Respondent lacked any *bona fides* in selecting the Respondent's mark to incorporate same into these domain names;

(8) As to the likelihood of expansion of the product lines: There was no evidence of any liklihood of expansion of product lines.

In considering each element of the test, it is clear to this Administrative Panel that, even if it is agreed **[*33]** that Sleekcraft is the appropriate test to apply where the administrative panel is guided by the laws of the USA, it is obvious that there remains many areas of doubt as to how the various elements of the test can be transposed in its application to disputes involving a comparison of domain names and trademarks.

The Complainant has argued that there is a clear similarity between the Complainant's <GUINNESS> mark and each of the said domain names in their entireties as to appearance, sound, connotation and commercial impression. The first word in each of the said domain names is <GUINNESS> which is identical to Complainant's <GUINNESS> mark. It is accepted that the Respondent took the Complainant's famous <GUINNESS> trademark and tacked on other words, such as "beer," "really," and "sucks" to form the said domain names.

The legal principles applicable to this element of the test in paragraph 4(a) remain unclear and the matter deserves debate. Many questions remain open. For example should an administrative panel accept the argument proposed by the administrative panel in Wal-Mart Stores Inc. v. Richard MacLeod d/b/a For Sale WIPO Case D2000-0662 that the phrase "identical **[*34]** or confusingly similar" is greater than the sum of its parts? Or would this be an extension of the test beyond that intended? It is inappropriate to engage in this debate in undefended proceedings such as the present.

Since these are undefended proceedings and in the absence of any Response from the Respondent this Administrative Panel is satisfied that the Complainant has made out a *prima facie* case that on balance, there is a likelihood of confusion between each of the said domain names and the trademarks in which the Complainant has rights. Although this Administrative Panel is conscious that there are strong arguments to the contrary, in the circumstances of this particular case, the Complainant is therefore entitled to the benefit of the decision on this issue. This Administrative Panel therefore decides that the Complainant has established a *prima facie* case that each said domain name in dispute is confusingly similar to a trademark in which the Complainant has rights.

As to the Respondent's rights or legitimate interest in the said domain names. This Administrative Panel accepts that the Complainant's <GUINNESS> mark is famous. The Complainant has not licensed or **[*35]** otherwise permitted the Respondent to use the <GUINNESS> trademark, or any other trademark incorporating the <GUINNESS> mark. The Complainant has not licensed or otherwise permitted the Respondent to apply for or use any domain name consisting of or incorporating the <GUINNESS> mark.

The Complainant has further made out a *prima facie* case that the Respondent is not making a legitimate non-commercial or fair use of the said domain names and that the Respondent registered the said domain names because he was angry with Complainant for filing an ICANN complaint seeking the transfer of the said www.guinnes.com domain name.

The Complainant has also alleged that the Respondent has not ever been commonly known by the domain names at issue, or by the term <GUINNESS> and in the absence of any denial by the Respondent, this Administrative Panel accepts that the Complainant has made out a *prima facie* case that it is so.

There is no evidence before this Administrative Panel that the Respondent intends to use the said domain names as the addresses or links to any sites which could be described as "complaint sites". For this reason the issues canvassed in any of the decisions relating **[*36]** to free speech are not relevant in this case.

In the circumstances, this Administrative Panel is satisfied that Complainant has established a *prima facie* case that the Respondent has no rights or legitimate interest in the said domain names or any of them.

As to the Complainant's submissions that the domain names in issue were registered and are being used in bad faith by the Respondent, this Administrative Panel accepts that the said domain names were registered by the Respondent for retaliatory purposes in direct response to the Complainant initiating the above mentioned administrative proceeding against the Respondent regarding the www.guinnes.com domain name.

The Complainant has submitted a print-out of a www page which the Complainant alleges was posted by the Respondent on which there is a statement by the Respondent that he registered the said domain names at issue in this proceeding because he was angered by Complainant's attempt to take the domain name www.guinnes.com away from him. This Administrative Panel accepts that the Complainant has made out a *prima facie* case that the Respondent registered said domain names with the intention of harassing the Complainant **[*37]** for its attempts to enforce its trademark rights and to tarnish the <GUINNESS> trademark.

Furthermore this Administrative Panel accepts the Complainant's submissions that if the Respondent were to establish www sites at the said domain name addresses, it is likely that such use would disrupt Complainant's legitimate business and divert members of the public from Complainant's www sites.

This Administrative Panel also accepts that the Complainant has established a *prima facie* case that the Respondent is a wholesaler of Internet domain names (defined as someone who acquires multiple domain names with the intent to profit from them). The Respondent has registered approximately 3000 domain names for this purpose. This Administrative Panel does not however accept the Complainant's submission that it would be unrealistic to assume, given the large number domain name registrations held by the Respondent that the Respondent could have intended to use all of those domain name registrations in good faith. Ownership of a large number of domain names should not in itself give rise to any inference of *mala fides*.

The Complainant has stated that the Respondent is no stranger to ICANN **[*38]** administrative proceedings and that there have been at least five ICANN decisions against the Respondent in which it has been found that he registered and used domain names that are identical or confusingly similar to famous trademarks in bad faith and without a legitimate business purpose. The Complainant has further referred to court proceedings in which the Respondent has been a party. This Administrative Panel is not required to take any inference from any such findings relating to other domain names and does not do so.

On balance, this Administrative Panel is satisfied that the Complainant has made out a *prima facie* case that the Respondent has registered and is using the said domain names primarily to disrupt the Complainant's legitimate business and divert members of the public from Complainant's www sites and in the circumstances and in the absence of any Response from the Respondent, this is sufficient to satisfy this Administrative Panel that the Respondent has registered each of the said domain names and is using each of said domain names in bad faith.

**7. Decision**

With specific reference to Paragraphs 4(i) of the Policy and 15 of the Rules this Administrative **[*39]** Panel decides that the Respondent has registered the domain names www.guinness-really-sucks.com; www.guinness-really-really-sucks.com; www.guinness-beer-really-sucks.com; www.guinness-beer-really-really-sucks.com; www.guinness-sucks.com; www.guinnessreallysucks.com; www.guinnessreallyreallysucks.com; www.guinnessbeerreallysucks.com; www.guinnessbeerreallyreallysucks.com; www.guinness-beer-sucks.com; and www.guinnessbeersucks.com which are identical or confusingly similar to a trademark or service mark in which the Complainant has rights, that the Respondent has no rights or legitimate interest in respect of said domain names or any of them and that the Respondent has registered and is using said domain names in bad faith.

Accordingly, this Administrative Panel decides that said domain names www.guinness-really-sucks.com; www.guinness-really-really-sucks.com; www.guinness-beer-really-sucks.com; www.guinness-beer-really-really-sucks.com; www.guinness-sucks.com; www.guinnessreallysucks.com; www.guinnessreallyreallysucks.com; www.guinnessbeerreallysucks.com; www.guinnessbeerreallyreallysucks.com; www.guinness-beer-sucks.com; and www.guinnessbeersucks.com should be transferred to the **[*40]** Complainant.

James Bridgeman

Page 45

2000 UDRP LEXIS 752, *

Sole Panelist

WIPO Arbitration and Mediation Center

NOTICE: Administrative Panel Decisions originally provided by the Secretariat of WIPO. The Secretariat of WIPO assumes no liability or responsibility with regard to the transformation of this data.

Wal-Mart Stores, Inc. v. Richard MacLeod d/b/a For Sale

Case No. D2000-0662

WIPO Arbitration and Mediation Center ADMINISTRATIVE PANEL DECISION

*2000 UDRP LEXIS 506*

September 19, 2000

OPINIONBY: David H. Bernstein, Sole Panelist

OPINION:

**[*1] 1. The Parties**

The Complainant is Wal-Mart Stores, Inc., a United States corporation with its headquarters in Bentonville, Arkansas, United States of America.

The Respondent is Richard MacLeod d/b/a For Sale, 21 Simpson Avenue, Toronto, ON M8Z1C9, United States of America.

**2. The Domain Name and Registrar**

The domain name at issue is www.wal-martsucks.com. The domain name is registered with Register.com.

**3. Factual Background**

The Panel has reviewed the Complainant's Complaint and Respondent's Response. The following facts appear to be undisputed: The Complainant operates over 2,500 stores worldwide. All its trading operations, advertisements and promotions are conducted under the mark "Wal-Mart," and it has used this mark continuously since 1962. Its Internet addresses include www.walmart.com, www.wal-mart.com, and www.walmartstores.com. Its businesses include discount retail stores, grocery stores, pharmacies, membership warehouse clubs, and deep discount warehouse outlets.

Complainant holds registrations for the mark "Wal-Mart" in the United States, Switzerland, the United Kingdom, Denmark, and numerous other countries. The Respondent has no rights granted by the **[*2]** Complainant in any of the marks involving the word "Wal-Mart".

The Respondent registered the domain name www.wal-martsucks.com on February 12, 2000.

**4. Procedural Background**

Complainant filed its Complaint by email on June 22, 2000. Because of a deficiency noted by the Center (Complainant had failed to comply with Rule 3(b)(xiii)), Complainant filed an Amended Complaint, which was received in hardcopy by the Center on July 10, 2000.

On July 14, 2000, the Center formally commenced this proceeding and notified Respondent that its Response would be due by August 2, 2000. Respondent timely filed its Response, which was received by the Center in hardcopy on July 26, 2000.

Meanwhile, on July 20, 2000, the Center released a decision in Wal-Mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, Case No. D2000-0477, which involved the same Complainant. The Panel in that case ruled that the domain names www.wal-martcanadasucks.com, www.walmartcanadasucks.com, www.walmartuksucks.com, www.walmartpuertorico.com and www.walmartpuertoricosucks.com were confusingly similar to Complainant's Wal-Mart trademark, that the respondent in that case lacked a legitimate interest in the domain **[*3]** names, and that the

domain names were registered and used in bad faith. The Panel thus ordered that the domain names be transferred to the Complainant.

On July 25, 2000, Complainant in this case requested leave to submit a reply in light of the decision in Case No. D2000-0447. On July 26, 2000, the Respondent indicated that he would not object to the filing of a reply, and requested that he be allowed to submit a sur-reply.

On August 4, 2000, the Center appointed a Panel. The Panelist thereafter developed a conflict of interest, and recused himself. On September 6, 2000, the Center appointed David H. Bernstein as a substitute Panelist. Neither party requested a three-member Panel.

On September 6, 2000, the Panel issued an order denying the Complainant's request for leave to file a reply, except that the Panel took note of the decision in Case No. D2000-0447, and denying as moot the Respondent's request to submit a sur-reply. On September 17, 2000, the Respondent asked that he be allowed to submit a statement regarding Case No. D2000-0447. In particular, Respondent requested the right to supplement his Response because, "should this case be used against me, I believe it would be **[*4]** fair to give me a chance to submit a few comments about that case."

The Panel denies Respondent's request to supplement his Response. First, the request is moot because Case No. D2000-0447 has not been "used against" him; the issues in this case are quite different and, although this Panel has read the decision in Case No. D2000-0447, that decision has not affected the Panel's findings and conclusions in this case. More generally, Respondent's request is inconsistent with the expedited process created by ICANN. If parties were allowed to supplement their submissions based solely on the issuance of a decision by another Panel, it would, given the pace with which UDRP decisions are issued, allow parties endlessly to drag out the UDRP process with replies and sur-replies and sur-sur-replies. See Document Technologies, Inc. v. International Electronic Communications, Inc., Case No. D2000-0270 (WIPO, June 6, 2000) (denying Complainant's request to file reply where proposed reply raised no new legal or factual authority, and thus would unnecessarily delay the final adjudication). When a new, relevant decision is issued (whether by another Panel or by a court), the appropriate course **[*5]** instead is for a party to bring the decision to the Panel's attention, without providing additional, substantive argument, so that the Panel can review the decision and use its own judgment as to whether that decision is relevant to the issues in the case before the Panel and, if so, how it affects the decision in the instant case. See Pet Warehouse v. Pets.Com, Inc., Case No. D2000-0105 (WIPO, Apr. 13, 2000) (accepting supplemental submission comprised of a new decision by another UDRP Panel that was submitted "without any argument").

**5. Parties' Allegations**

The Complainant submits that its mark is famous throughout the United States and all those other countries in which it trades. It further argues that the domain name is identical to its "Wal-Mart" mark because the domain name wholly incorporates "Wal-Mart" and also is confusingly similar to its "Wal-Mart" marks because "Wal-Mart" is so famous that buyers "would be likely to think that any commercial site connected with the domain name www.wal-martsucks.com, particularly a site selling consumer products," or "any domain name incorporating the Wal-Mart name (or a close approximation thereof)" originates with the Complainant.

**[*6]** The Complainant argues that Respondent has no rights or legitimate interests in respect of the domain name. First, Respondent is not currently using the domain name in connection with any ongoing business. Second, to the best of the Complainant's knowledge, Respondent has no rights to any use of the term Wal-Mart.

The Complainant further submits that the domain name www.wal-martsucks.com was registered and is used in bad faith. Improper use of the name is shown by the Respondent's attempt to sell the name through the Great Domains website for $ 530,000 and on Respondent's website for $ 545,000.

The Respondent focuses his response on the first factor of the ICANN policy, arguing that www.wal-martsucks.com is neither identical to nor confusingly similar to "Wal-Mart." He relies on *Bally Total Fitness Holding Corp. v. Faber, 29 F. Supp. 2d 1161 (C.D. Cal. 1998),* which concluded that the addition of the word "sucks" prevents any reasonably prudent user from confusing a "sucks" website with an authorized website.

Respondent concedes that his original intention upon registration of www.wal-martsucks.com was to sell the name for profit, and concedes that **[*7]** this constitutes registration in bad faith, but claims that he had a "change of heart" when he learned of Wal-Mart's abusive employment and consumer practices, so that the website no longer is being "used" in bad faith. He further claims that Wal-Mart cannot prove that it was actually Respondent who offered www.wal-martsucks.com for sale because Great Domains does not verify sellers. Thus, he claims that Complainant has insufficient evidence to show bad faith. Finally, he suggests that Complainant knew of the availability of the www.wal-martsucks.com domain name long before he registered it and should have done so when the name was available.

**6. Discussion and Findings**

The burden for the Complainant under paragraph 4(a) of the ICANN Policy is to prove:

(a) That the domain name registered by the Respondent is identical or confusingly similar to a trademark or service mark in which the Complainant has rights;

(b) That the Respondent has no rights or legitimate interests in respect of the domain name; and

(c) The domain name has been registered and used in bad faith.

Initially, the Panel rejects any suggestion that Complainant's failure to register www.wal-martsucks.com before [*8] Respondent did so precludes this Complaint under any theory, including laches. Trademark owners are not required to create "libraries" of domain names in order to protect themselves, and there are strong policy reasons against encouraging this behavior. Moreover, as human creativity reaches its utmost where disparagement (not to mention money) is involved, any such attempt by a trademark owner would be futile, and thus Respondent has no equitable argument against Complainant.

The second and third elements of the Policy are easily disposed of in this case. Respondent's sole argument with respect to the second element is that he is using www.wal-martsucks.com to criticize Wal-Mart. Respondent could potentially have a legitimate interest in using www.wal-martsucks.com as a site critical of Wal-Mart; the Policy specifically provides that "a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark," can establish legitimate rights and interests in a domain name. Policy paragraph 4(c)(iii). In this case, however, Complainant alleges, and Respondent does not deny, that before [*9] Complainant initiated the present proceeding, he was using the site solely for the purpose of selling it. While Respondent claims to have had a "change of heart," this change appears to have been driven by his domain name disputes with Complainant, and it is too little, too late.

Respondent admits that he registered the domain name in bad faith. The Panel specifically rejects Respondent's argument that Complainant produced insufficient evidence of bad faith use. Though Respondent questions the reliability of the information on the Great Domains website (Respondent claims that anyone can list a domain name for sale on that site, and thus Complainant has not proven that it is Respondent who offered the name for sale), he never actually denies that it was he who listed www.wal-martsucks.com on Great Domains, nor does he deny that he offered the domain name for sale on his own site. Indeed, the Respondent's intent is made clear by the name in which he registered the domain name: "For Sale." See Unibanco v. Vendo Domain Sale, Case No. D2000-0671 (WIPO, Aug. 31, 2000). Combined with Respondent's own admission, this is ample evidence of bad faith use. Again, Respondent's newly developed [*10] critical use of the site during the pendency of this proceeding is insufficient to erase the prior bad faith use.

The difficult question in this case is whether Complainant has shown that www.wal-martsucks.com "is identical or confusingly similar to" Complainant's mark under Paragraph 4(a)(1) of the Policy. In prior cases, this Panel has held that a domain name that incorporates a mark but also adds another word is not "identical" to the mark under the Policy. See, e. g., EAuto, L.L.C. v. Triple S. Auto Parts d/b/a Kung Fu Yea Enterprises, Inc., No. D2000-0047 (WIPO, Mar. 24, 2000). This Panel has also held that incorporating a distinctive mark in its entirety creates sufficient similarity between the mark and the domain name to render it confusingly similar. Id.

Following this reasoning, Complainant contends that consumers are likely to believe that any domain name incorporating the sequence "Wal-Mart" or a close approximation thereof is associated with Complainant. In the ordinary case, when a generic term is appended to the trademark (such as the domain name www.walmartstores.com), this would be so. But the fame of a mark does not always mean that consumers will associate [*11] all use of the mark with the mark's owner. No reasonable speaker of modern English would find it likely that Wal-Mart would identify itself using www.wal-martsucks.com. Complainant has no evidence of any potential confusion. The Panel specifically rejects Complainant's argument that consumers are likely to be confused as to the sponsorship or association of a domain name that combines a famous mark with a term casting opprobrium on the mark.

Nevertheless, the Panel understands the phrase "identical or confusingly similar" to be greater than the sum of its parts. The Policy was adopted to prevent the extortionate behavior commonly known as "cybersquatting," in which parties registered domain names in which major trademark owners had a particular interest in order to extort money from those trademark owners. This describes Respondent's behavior. Thus, the Panel concludes that a domain name is "identical or confusingly similar" to a trademark for purposes of the Policy when the domain name includes the trademark, or a confusingly similar approximation, regardless of the other terms in the domain name. In other words, the issue under the first factor is not whether the domain name causes [*12] confusion as to source (a factor more appropriately considered in connection with the legitimacy of interest and bad faith factors), but instead whether the mark and domain name, when directly compared, have confusing similarity. Having so concluded, Respondent's use of the domain name www.wal-martsucks.com meets all three of the conditions necessary to justify a transfer of the domain name to Complainant.

The Panel is cognizant of the importance of protecting protest sites that use a trademark to identify the object of their criticism. The "legitimate interest" and "bad faith" factors should adequately insulate true protest sites from vulnerability under the Policy, especially as the Complainant retains the burden of proof on each factor. Where, as here, a domain name registrant does not use a site for protest but instead offers it for sale for substantially more than the costs of registration, the site does not further the goal of legitimate protest; rather, it constitutes trademark piracy.

**7. Decision**

For the foregoing reasons, the Panel decides:

(a) that the domain name www.wal-martsucks.com is identical or confusingly similar to the Wal-Mart trademark in which the Complainant **[*13]** has rights;

(b) that the Respondent has no rights or legitimate interests in respect of the domain name; and

(c) the Respondent's domain name has been registered and is being used in bad faith.

Accordingly, pursuant to paragraph 4(i) of the Policy, the Panel requires that the registration of the domain name www.wal-martsucks.com be transferred to the Complainant.

David H. Bernstein

Sole Panelist

THE NATIONAL ARBITRATION FORUM
PO BOX 50191
MINNEAPOLIS, MINNESOTA 55405 USA
DECISION


CABELA'S INCORPORATED


vs.


CUPCAKE PATROL


Claim Number: FA0006000095080


Domain Name : CABELASSUCKS.COM


PARTIES


   The Complainant is Cabela's Incorporated, Sidney, NE, USA ('Complainant '). The
Respondent is Cupcake Patrol, Andalusia, PA, USA ('Respondent').

REGISTRAR AND DISPUTED DOMAIN NAME(S)


   The domain name at issue is 'CABELASSUCKS.COM', registered with Core Internet
Council of Registrars ('Core').


PANELIST


   The Panelist certifies that she has acted independently and impartially and to
the best of her knowledge, has no known conflict in serving as the panelist in this
proceeding.


   Honorable Carolyn Marks Johnson sits as Panelist.


PROCEDURAL HISTORY


   Complainant submitted a Complaint to the National Arbitration Forum ('The Forum')
electronically on 06/29/2000; The Forum received a hard copy of the Complaint on

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

07/13/2000.

On 07/19/2000, Core confirmed by e-mail to The Forum that the domain name 'CABELASSUCKS.COM' is registered with Core and that the Respondent is the current registrant of the name.

On 07/24/2000, a Notification of Complaint and Commencement of Administrative Proceeding (the 'Commencement Notification'), setting a deadline of 08/14/2000 by which Respondent could file a Response to the Complaint, was transmitted to Respondent via e-mail, post and fax, and to all entities and persons listed on Respondentís registration as technical, administrative and billing contacts by e-mail. It was also emailed to postmaster@cabelassucks.com.

On 08/16/2000, having received no Response from Respondent, using the same contact details and methods as were used for the Commencement Notification, The Forum transmitted to the parties a Notification of Respondent Default.

On 08/17/2000, pursuant to Complainantís request to have the dispute decided by a Single Member panel, The Forum appointed Honorable Carolyn Marks Johnson as Panelist.

Having reviewed the communications records, the Administrative Panel (the 'Panel') finds that The Forum has discharged its responsibility under Paragraph 2(a) of the Uniform Rules 'to employ reasonably available means calculated to achieve actual notice to Respondent.' Therefore, the Panel may issue its Decision based on the documents submitted and in accordance with the ICANN Policy, ICANN Rules, The Forumís Supplemental Rules and any rules and principles of law that the Panel deems applicable, without the benefit of any Response from the Respondent.

RELIEF SOUGHT

Complainant requests that the domain name be transferred from Respondent to Complainant.

PARTIESÍ CONTENTIONS

A. Complainant

Complainant contends that Respondent adopted a name that is confusingly similar to Complainantís registered mark. Complainant asserts that Respondent has no legitimate rights in the domain name and has registered and used the domain name in bad faith.

Complainant contends that Respondentís website that corresponds to the domain

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

name in question is offered for no legitimate purpose other than to harass Internet users. Complainant maintains that Respondent attempted to deceive customers into believing that the said domain name was owned, operated, and maintained by Complainant.

B. Respondent

The Respondent has failed to submit a response in this matter.

FINDINGS

ICANN Uniform Rule 14(b) provides that, absent exceptional circumstances, the Panel shall draw inferences, as it deems appropriate, from the failure of a party to comply with a provision or requirement of the Uniform Rules. As a result, all reasonable inferences asserted in the Complaint will be deemed true.

Complainant is the owner of the trademark 'Cabelais' pursuant to the u.S. Trademark Registration Numbers 1,151981 and 1,224,738. Complainant has been utilizing this mark since at least 1961. Complainant uses this mark in connection with the sale of hunting, fishing, and outdoor clothing and equipment. Complainantís mark is distinctive and famous.

Complainant uses the domain name <cabelas.com> for on-line sales of merchandise and services. Complainant is the owner of the trademark CABELAS.COM pursuant to the U.S. Trademark Registration No. 2,247,977 and Complainant has used this mark since at least 1996.

Respondent has made no use of the website that corresponds with the domain name in question.

Respondent has no affiliation or relationship with the Complainant.

Respondent did not accept correspondence from Complainant by certified mail, overnight mail, or facsimile. The only method of communication between Respondent and Complainant was via e-mail. In correspondence with the Complainant, Respondent indicated that he registered the domain name in reference to the vocal toning and spiritual music website <cabala.com>.

Respondent registered the domain name in retaliation after Complainant requested John Zuccarini, who is affiliated with the Respondent, to transfer to Complainant another domain name he had registered, <cabela.com>.

Respondent has engaged in a similar pattern of conduct of registering domain

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

names that infringe on other companiesí trademarks.

DISCUSSION

Paragraph 4(a) of the ICANN Uniform Domain Name Dispute Policy ('Policy ') requires that the complainant must prove each of the following three elements to obtain an order that a domain name should be cancelled or transferred:

(1) the domain name registered by the Respondent is identical or confusingly similar to a trademark or service mark in which the Complainant has rights;

(2) the Respondent has no rights or legitimate interests in respect of the domain name; and

(3) the domain name has been registered and is being used in bad faith.

Identical and/or Confusingly Similar

Complainant has rights in the registered trademarks, 'Cabelais' and 'Cabelas.com'. The addition of a common or generic term following a trademark does not create a new or different mark in which the Respondent has rights. See General Electric Co. v. Forddirect.com, Inc., D2000-0394 (WIPO June 22, 2000) (finding that adding the generic term 'direct' on to the Complainantís marks (GE CAPTIAL and GECAL) does not alter the underlying mark held by the Complainant, and thus the Respondentís domain names are confusingly similar).

Courts and other UDRP Panels have recognized that the intentional registration of a domain name while knowing that the second-level domain contains anotherís valuable trademark weighs in favor of a likelihood of confusion. See Minnesota Min. and Mfg. Co. v. Taylor, 21 F.Supp.2d 1003, 1005 (D.Minn. 1998); Intermatic Inc. v. Toeppen, 947 F.Supp. 1227, 1235- 1236 (N.D.Ill. 1996).

Courts and UDRP Panels have also addressed the issue of appending the term '-sucks' to anotherís trademark. See Lucent Technologies, Inc. v. Lucentsucks.com, 95 F.Supp.2d 528 (E.D. Va. 2000); Bally Total Fitness v. Faber, 29 F.Supp.2d 1161 (C.D. Cal. 1998); Wal-mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, D2000-0477 (WIPO July 20, 2000). The Panel does not infer that '-sucks' domain names are immune from scrutiny as being confusingly similar to trademarks to which they are appended. Each case must be considered in light of the facts presented. The Panel in Wal-mart Stores, Inc. v. Walsucks and Walmarket Puerto Ricoidentified that the confusingly similar test may be held to a different standard when used with Internet search engines. SeeWal- mart Stores, Inc. v. Walsucks and Walmarket Puerto Rico, D2000-0477 (WIPO July 20, 2000).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

By using Complainantís marks in its domain names, Respondent makes it likely that Internet users entering 'Cabelais' into a search engine will find 'CABELASSUCKS.COM' in addition to the Complainantís site <cabelas.com>. Respondentís domain name is sufficiently similar to Complainantís marks that the search engine results will confusingly list the Respondentís domain name when searching for Complainantís mark. See id.

The Panel concludes that the Respondentís domain name is confusingly similar to the Complainantís marks.

RIGHTS OR LEGITIMATE INTERESTS

Respondent has failed to offer any evidence of rights or legitimate interests in the domain name in question.

Respondent has made no use of the domain name in question and has not used the domain name in connection with any bona fide offering of goods or services. Policy +4.c.(i). Respondent is not making a legitimate noncommercial or fair use of the domain name. Policy + 4.c.(iii). The Panel notes that use of a '-sucks' domain name may be justified by fair use or legitimate noncommercial use considerations for free expression forums. However, this is not the situation in this case. The Panel does not construe that the Respondent registered the domain name in order to express opinions or to seek opinions of others. The Complaint indicates that Respondent registered this domain name in retaliation against Complainant.

In correspondence with Complainant, Respondent indicated that he registered the domain name in connection with the domain name <cabala.com>, a website devoted to vocal toning and spiritual music. Given Respondentís failure to respond in this ICANN dispute and failure to use the domain name for such purposes, the Panel finds this unpersuasive.

Respondent is not commonly known by the domain name in question. Policy +4.c.(ii). Complainant has been using its mark for almost forty years. Respondent is not known by Complainantís mark, but rather is known by many the pseudonyms including, Country Walk, John Zuccarini, and Cupcake Party.

The Panel determines that Respondent has no rights or legitimate interests in the domain name in question.

REGISTRATION AND USE IN BAD FAITH

Complainant contends that Respondent registered and used the domain name in bad faith.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Because Respondentís conduct does not fall within the ëparticularí circumstances set out in + 4.b. does not mean that the domain names at issue were not registered in and are not being used in bad faith. See Educational Testing Service v. TOEFL, D2000-0044 (WIPO Mar. 16, 2000) (finding that the Policy 'Indicates that its listing of bad faith factors is without limitation').

Respondent registered the domain name in response to Complainantís request that John Zuccarini transfer the domain name <cabela.com> to Complainant. Respondent registered this domain name in bad faith to retaliate against Complainant.

Respondent has engaged in a pattern of conduct of registering domain names that infringe upon otherís trademarks. For example, Respondent registered < hewlittpackard.com>, which is confusingly similar to the trademark owned by Hewlett Packard. Respondent also registered the domain name <e-cardssucks.com> in response to a recent lawsuit awarding 'e-cards.com' a four million-dollar award. These are only a few of many domain names that Respondent owns that infringe upon otherís famous marks. The Panel concludes that Respondent has registered the domain name in question in order to prevent Complainant from reflecting its registered mark in a corresponding domain name. Policy + 4.b. (ii). See Encyclopaedia Britannica, Inc. v. John Zuccarini and The Cupcake Patrol a/ka Country Walk a/k/a Cupcake Party,D2000-0330 (WIPO June 7, 2000).

Respondent has made no use of the domain name in question. Passive holding of a domain name with knowledge that the domain name infringes on another partyís trademark rights is evidence of using in bad faith. SeeTelstra Corp. v. Nuclear Marshmallows, D2000-0003 (WIPO Feb. 18, 2000) ('It is possible, in certain circumstances, for inactivity by the Respondent to amount to the domain name being used in bad faith').

The Panel determines that Respondent registered and is using the domain name in question in bad faith.

DECISION

Having established all three elements required by the ICANN Policy Rule 4(a), it is the decision of the Panel that the requested relief be granted.

Accordingly, for all of the foregoing reasons, it is ordered that the domain name, 'CABELASSUCKS.COM', be transferred from Respondent to Complainant.

Dated: August 29, 2000

Honorable Carolyn Marks Johnson

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2000 WL 33948966
Claim Number: FA0006000095080

Page 8

Copyright © 2001 National Arbitration Forum

Copyright (c) 2003 West Group

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

WIPO Arbitration and Mediation Center

NOTICE: Administrative Panel Decisions originally provided by the Secretariat of WIPO. The Secretariat of WIPO assumes no liability or responsibility with regard to the transformation of this data.

Direct Line Group Ltd, Direct Line Insurance plc, Direct Line Financial Services Ltd, Direct Line Life Insurance Company Ltd, Direct Line Unit Trusts Ltd, Direct Line Group Services Ltd v. Purge I.T., Purge I.T. Ltd

Case No. D 2000-0583

WIPO Arbitration and Mediation Center ADMINISTRATIVE PANEL DECISION

2000 UDRP LEXIS 443

August 13, 2000

OPINIONBY: William R. Cornish, Panelist

OPINION:
[*1] **1. The Parties**
Complainants:
(1) Direct Line Group Ltd
(2) Direct Line Insurance plc
(3) Direct Line Financial Services Ltd
(4) Direct Line Life Insurance Company Ltd
(5) Direct Line Unit Trusts Ltd
(6) Direct Line Group Services Ltd
All of 3, Edridge Road, Croydon, Surrey CR9 1AG, United Kingdom.
Respondents:
(1) Purge I.T. of Park Farm Cottage, St Giles Close, Wendlebury, Oxon OX6 7AA, U.K.
(2) Purge I.T. Ltd of Unit D3a, Telford Road, Bicester, Oxford OX6 0TZ, U.K.
The Domain Name and Registrar:
DIRECTLINESUCKS.COM, registered by Network Solutions, Inc. on May 11, 1999, to the Registrant: Purge I.T. (Directlinesucks-dom); (Contacts: OzNic.com — Administrative: (AMD598-ORG), Technical and Zone: (ITT-ORG), Billing: (ITA3-ORG))

**2. Procedural History**
(1) The Complaint in Case D 2000-0583 was filed on June 12, 2000.
(2) The WIPO Arbitration and Mediation Center has found that:
- the Complaint was filed in accordance with the requirements of the Rules and Supplemental Rules for the Dispute Resolution Policy;
- payment for filing was properly made;
- the Complaint complies with the formal requirements;

The Panel accepts these findings and itself finds that:
- [*2] the Complaint was properly notified in accordance with the Rules, paragraph 2(a), having been sent to the Respondents and the Contacts abovenamed by Post/Courier, Fax and E-mail.
- A Response to the Complaint was filed in due time, though a copy was not sent by the Respondents to the Complainants; as required by Rule 2(h) of the Dispute Resolution Policy.
- the Administrative Panel was properly constituted.

(3) The Panelist submitted a Statement of Acceptance and Declaration of Impartiality and Independence.
(4) There has been a further submission from the Complainants consisting of comments on the Response. Due to the

failure of the Respondents to send the response to the Complainants, the Panel decided that it must in the circumstances be admitted. In order to avoid any consequent prejudice to the Respondents, the Panel in turn permitted the Respondents until August 6, 2000, to offer their own comments. None have been received.
(5) The date originally scheduled for issuance of a decision was: August 8, 2000. In light of the circumstances mentioned in the previous paragraph, the Panel ordered that this be changed to August 13, 2000.
(6) The language of the proceedings is [*3] English.

**3. Factual Background**

(1) The Complainants are a group of United Kingdom companies of which the first-named is the parent. Between them they do considerable business in that country in insurance, mortgages and other loans, life assurance, savings accounts and other financial services, the sixth **Complainant** providing various service and contracting functions to the others. The Complaint has furnished detailed evidence of the considerable amounts of business undertaken by the second to the fifth Complainants, all of which employ the mark, "Direct Line", for their services and products.
On behalf of the Direct Line group, the second Complainant is proprietor of 20 registrations of trade marks in the United Kingdom, consisting of or incorporating as a major feature the words, "Direct Line". The registrations are held for various insurance and other financial services and also for considerable categories of goods and all date from before registration of the Domain Name in dispute.
(2) The Complainants also hold 52 TLDs which incorporate "directline" or "directlines". Many of these add a further word without any break, as in www.directlineinsurance.com, www.directlineclub.com.
[*4] (3) The Complaint forms one of a series against the Respondents or the corporate Respondent alone. The Response to these cases has been by a single document, which indicates that the Domain Name Registrations in issue were made in pursuit of the same business objective. The Complainants have demonstrated by WhoIs database searches that the Respondents have registered with Network Solutions the names or abbreviations of eighteen well-known British enterprises with the addition of "sucks". All were obtained on May 11, 1999. Five have resulted in the parallel complaints which have been referred conjointly to the present Panel. The other four are D2000-0584 (www.dixonssucks.com), D2000-0585 (www.freeservesucks.com), D2000-0636 (www.natwestsucks.com) and D2000-0681 (www.standardcharteredsucks.com).

**4. Parties' Contentions**

A. Complainants
The Complainants assert the following:
- The Respondents' Domain Name at issue is identical with or confusingly similar to the Complainants' trade marks indicated above.
- The Respondents have no legitimate interest in the names for which the Complainants have registered marks.
- The Respondents registered the Domain Name and are using it in bad [*5] faith in that they are seeking to obtain financial gain from it by securing its transfer for a substantial sum to the Complainants and have repeatedly offered it to the Complainants on such terms.
- Accordingly the Complainants seek transfer of the Domain Name in issue to themselves.

B. Respondents
The Respondents, while not contesting directly the documentary material submitted as annexes to the Complaint, nevertheless deny that they have acted in bad faith or that they have ever used the Domain Name after registration. In particular:
- They did not secure the Domain Name in order itself to establish any website.
- They did not intend to transfer the registration to anyone other than the Complainants, and in particular not to any disgruntled person who might wish to acquire it in order to host complaints against the Complainants or otherwise to extract revenge. On the contrary their motivation was to protect the Complainants against such risks.
- Mere registration without more cannot amount to use.

**5. Discussion and Findings**

In accordance with the Dispute Resolution Policy, Paragraph 4(a), the Complainants bear the burden of demonstrating three elements.
Element 1: [*6] *That the **Complainants** have rights in a trade or service mark, with which the Respondents' Domain Name is identical or confusingly similar.*
As they have clearly demonstrated in their Complaint, the Complainants have a well-known trade mark for banking and associated services in the United Kingdom. This reputation is protected by the registration of the trade marks already referred to in Paragraph 3(1) and further enhanced by the use which they make of their Domain Names also there referred to. The Respondents' explanation of the conduct which they have pursued in relation to the names of various

major enterprises is as follows:
"The company was set up in response to an article in The Times newspaper referring to disgruntled consumers registering domain names such as www.walmartsucks.com to host complaints sites against companies."
The Respondents' registration, consisting of the Complainants' name with the suffix, "sucks" (plus ".com"), is not identical to the Complainants' marks and the question arises whether the registration is confusingly similar to those marks.
Given the apparent mushrooming of complaints sites identified by reference to the target's name, can it be [*7] said that the registration would be recognised as an address plainly dissociated from the Complainants? In the Panel's opinion, this is by no means necessarily so. The first and immediately striking element in the Domain Name is the Complainants' name and adoption of it in the Domain Name is inherently likely to lead some people to believe that the Complainants are connected with it. Some will treat the additional "sucks" as a pejorative exclamation and therefore dissociate it after all from the Complainants; but equally others may be unable to give it any very definite meaning and will be confused about the potential association with the Complainants. The Complainants have accordingly made out the first element in its Complaint (see the rather similar conclusion on this element in Case D 2000-0477 (www.walmartcanadasucks.com)).
Element 2: *The Respondents must be shown to have no rights or legitimate interests in the Domain Name.*
The Complainants' reputation was well established before the Respondents began their activity, as is evident from their own statement of purpose, which is said to be, to help protect enterprises against being bothered by customer sites at which grievances [*8] are aired. Complaints sites are only likely to be set up against businesses with considerable reputations. Those who have genuine grievances against others or wish express criticisms of them — whether the objections are against commercial or financial institutions, against governments, against charitable, sporting or cultural institutions, or whatever — must be at liberty, within the confines set by the laws of relevant jurisdictions, to express their views. If today they use a website or an email address for the purpose, they are entitled to select a Domain Name which leads others easily to them, if the name is still available.
The Respondents, contrarily, make it plain that their purpose is to have none of such free expression. They want, so they say, to protect against such engines of free speech. They claim as their own legitimate interest that they are in the business of obtaining Domain Names which might embarrass well-known enterprises if the names were allowed to fall into the hands of critics. The Respondents do not, however, act in a wholly altruistic spirit, since, as will be discussed further under Element 3, they seek substantial sums beyond their own costs before [*9] they will transfer over the offending registration. This latter aspect has to be brought into account in considering whether the Respondents therefore have any "right or legitimate interest" in the Domain Name, with which they otherwise have no association whatsoever and which they admit to have selected by reference to the Complainants' reputation in their own marks. The Panel finds that there is no justification for the role of officious interferer which the Respondents have taken upon themselves to provide in the manner in which they have chosen to do so. The Complainants have accordingly made out the second element (see likewise Case D 2000-0477 (www.walmartcanadasucks.com)).
Element 3: *that the Respondents registered and are using the Domain name in bad faith, in one of the senses of that term set out in Paragraph 4b of the Dispute Settlement Policy.*
The first Complainant received a letter of February 9 2000 from the Respondents offering to transfer the domain name for a "five figure sum" to be paid directly to a charity chosen by the Respondents. This must be read as a reference to a sum of at least GBP 10,000. Subsequently, according to attendance notes whose content has [*10] not been challenged by the Respondents, the Complainants' solicitor had two conversations with Mr Joseph Rice of Purge (on March 6 and 29, 2000). The upshot of these was an indication that a payment of somewhere in the region of GBP 5,000, paid directly to Purge, would, subject to checking, be needed to compensate for the time and expense involved. Taken together with Mr Rice's assurance that the whole purpose of registering the name was to enable its transfer to the Complainants, the Panel finds that these facts constitute plain evidence of circumstances indicating that the Respondents registered the name primarily for the purpose of selling, renting or otherwise transferring the domain name registration to the Complainants who are the owners of the relevant marks for valuable consideration in excess of documented out-of-pocket costs directly related to the domain name. Paragraph 4(b)(i) of the Dispute Resolution Policy states that such conduct is of itself to count as registration and use of the Domain Name in bad faith. Accordingly the third and final Element of the Complaint is made out.

**6. Decision**

The Panel decides, in accordance with the Uniform Domain Name Dispute Resolution [*11] Policy, Paragraph 4a and 4b,
- that the Domain Name in dispute is confusingly similar to the registered trade and service marks of the Complainants;
- that the Respondents have no rights or legitimate interests in respect of the Domain Name; and

– that the Domain Name has been registered and is being used in bad faith.

The Panel accordingly requires that the Domain Name WWW.DIRECTLINESUCKS.COM be transferred forthwith to the Second Complainant as specified in the Complaint.

William R. Cornish

Panelist

WIPO Arbitration and Mediation Center

NOTICE: Administrative Panel Decisions originally provided by the Secretariat of WIPO. The Secretariat of WIPO assumes no liability or responsibility with regard to the transformation of this data.

Dixons Group PLC v. Purge I.T. and Purge I.T. Ltd

Case No. D 2000-0584

WIPO Arbitration and Mediation Center ADMINISTRATIVE PANEL DECISION

2000 UDRP LEXIS 444

August 13, 2000

OPINIONBY: William R. Cornish, Panelist

OPINION:

[*1] **1. The Parties**

Complainant: Dixons Group PLC of Maylands Avenue, Hemel Hempstead, Herts HP2 7TG, United Kingdom
Respondents: (1) Purge I.T. of 23, Thompson Drive, Bicester, Oxon OX6 0TZ, United Kingdom;
(2) Purge I.T. Ltd of Unit D3a, Telford Road, Bicester, Oxford OX6 0TZ, United Kingdom.
The Domain Name and Registrar:
DIXONSSUCKS.COM, registered by Network Solutions, Inc. on May 11, 1999, to the Registrants Purge I.T. (Dixonssucks-dom) (Contacts: OzNic.com — Administrative: (AMD598-ORG), Technical and Zone: (ITT-ORG), Billing: (ITA3-ORG))

**2. Procedural History**

(1) The Complaint in Case D2000-0584 was filed on June 12, 2000.
(2) The WIPO Arbitration and Mediation Center has found that:
- the complaint was filed in accordance with the requirements of the Rules and Supplemental Rules for the Dispute Resolution Policy;
- payment for filing was properly made;
- the Complaint complies with the formal requirements;
The Panel accepts these findings and itself finds that:
- the Complaint was properly notified in accordance with the Rules, paragraph 2(a), having been sent to the Respondents and the Contacts above-named by Post/Courier, Fax and E-mail.
- A Response to [*2] the Complaint was filed in due time, though a copy was not sent by the Respondents to the Complainant; as required by the Dispute Redsoloution Policy, Rule 2(h).
- the Administrative Panel was properly constituted.
(1) The Panelist submitted a Statement of Acceptance and Declaration of Impartiality and Independence.
(2) There has been a further submission from the Complainant consisting of comments on the Response. Due to the failure of the Respondents to send the response to the Complainant immediately, the Panel decided that this submission must in the circumstances be admitted. In order to avoid any consequent prejudice to the Respondents, the Panel in turn permitted the Respondents until August 6, 2000, to offer their own comments. None have been received.
(3) The date originally scheduled for issuance of a decision was: August 6, 2000. In light of the circumstances mentioned in the previous paragraph, the Panel ordered that this be changed to August 13, 2000.
(4) The language of the proceedings is English.

**3. Factual Background**

(1) The Complainant is registered proprietor of numerous trade and service marks for "Dixons", in the main without additions, as scheduled in [*3] the Complaint, Annex 9. These registrations are held in the United Kingdom, from where the group of the Complainant's companies (as set forth in the Complaint, Annex 5) operates; and also in Australia,

the Czech Republic, France Germany, Greece, the Irish Republic, Italy, Japan, Norway, Poland, Portugal, Russia, Singapore, Spain and Switzerland. In each case the range of goods and services for which the Complainant is registered is wide, and relates in particular to its business as a supplier of photographic equipment and services, and supplier of a variety of other electrical and associated products. The Complainant has also provided evidence of its very considerable trading figures and expenditure on advertising and of the comment which its business attracts in the press.

(2) The Complainant also holds twenty-eight TLDs which incorporate "Dixons" or "dixons" in slightly varied forms. They were registered on dates between 1996 and 1998.

(3) The Complaint forms one of a series against the Respondents or the corporate Respondent alone, The Response to these cases has been by a single document, which indicates that the Domain Name Registrations in issue were made in pursuit of the [*4] same business objective. The Complainant has demonstrated by WhoIs database searches that the Respondents have registered with Network Solutions the names or abbreviations of eighteen well-known British enterprises with the addition of "sucks". All were obtained on May 11, 1999. Five have resulted in the parallel complaints which have been referred conjointly to the present Panel. The other four are D2000-0583 (www.directlinesucks.com), D2000-0585 (www.freeservesucks.com), D2000-0636 (www.natwestsucks.com) and D2000-0681 (www.standardcharteredsucks.co

**4. Parties' Contentions**

A. Complainant

The Complainant asserts the following:

- The Respondents' Domain Name at issue is identical to or confusingly similar to the Complainant's trade marks indicated above.
- The Respondents have no legitimate interest in the name for which the Complainant has registered marks.
- The Respondents registered the Domain Name and are using it in bad faith in that they are seeking to obtain financial gain from it by securing its transfer for a substantial sum to the Complainant and have repeatedly offered it to the Complainant on such terms.
- Accordingly the Complainant seeks transfer of the [*5] Domain Name in issue to itself

B. Respondents

The Respondents, while not contesting directly the documentary material submitted as annexes to the Complaint, nevertheless deny that they have acted in bad faith or that they have ever used the Domain Name after registration. In particular:

- They did not secure the Domain Name in order themselves to establish any website; they have not done so and any "Under Construction" label was presumably set up by the ISP;
- They did not intend to transfer the registration to anyone other than the Complainant, and in particular not to any disgruntled person who might wish to acquire it in order to host complaints against the Complainant or otherwise to extract revenge. On the contrary their motivation was to protect the Complainant against such risks.
- Mere registration without more cannot amount to use.

**5. Discussion and Findings**

In accordance with the Dispute Resolution Policy, Paragraph 4(a), the Complainant bears the burden of demonstrating three elements.

Element 1: *That the Complainant has rights in a trade or service mark, with which the Respondents' Domain Name is identical or confusingly similar.*

As it has clearly demonstrated [*6] in its Complaint, the Complainant has a well-known trade mark for the supply of photographic and electrical products and associated services, most notably the United Kingdom but also in other countries. This reputation is protected by the registration of the trade marks already referred to in Paragraph 3(1) and is further enhanced by the use which it makes of its Domain Names also there referred to. The Respondents' explanation of the conduct which they have pursued in relation to the names of various major enterprises is as follows:

"The company was set up in response to an article in The Times newspaper referring to disgruntled consumers registering domain names such as www.walmartsucks.com to host complaints sites against companies." (Response, para. 8)

The Respondents' registration, consisting of the Complainant's name with the suffix, "sucks" (plus ".com"), is not identical to the Complainant's marks and the question arises whether the registration is confusingly similar to those marks.

Given the apparent mushrooming of complaints sites identified by reference to the target's name, can it be said that the registration would be recognised as an address plainly dissociated from [*7] the Complainant? In the Panel's opinion, this is by no means necessarily so. The first and immediately striking element in the Domain Name is the Complainant's name. Adoption of it in the Domain Name is inherently likely to lead some people to believe that the Complainant is connected with it. Some will treat the additional "sucks" as a pejorative exclamation and therefore dissociate it after

all from the Complainant; but equally others may be unable to give it any very definite meaning and will be confused about the potential association with the Complainant. The Complainant has accordingly made out the first element in its Complaint (see the rather similar conclusion on this Element in Case D2000-0477 (www.walmartcanadasucks.com).
Element 2: *The respondents must be shown to have no rights or legitimate interests in the Domain Name.*

The Complainant's reputation was well established before the Respondents began their activity, as is evident from their own statement of purpose, which is said to be, to help protect enterprises against being bothered by customer sites at which grievances are aired. Complaints sites are only likely to be set up against businesses with considerable [*8] reputations. Those who have genuine grievances against others or wish express criticisms of them — whether the objections are against commercial or financial institutions, against governments, against charitable, sporting or cultural institutions, or whatever — must be at liberty, within the confines set by the laws of relevant jurisdictions, to express their views. If today they use a website or an email address for the purpose, they are entitled to select a Domain Name which leads others easily to them, if the name is still available.

The Respondents, contrarily, make it plain that its purpose is to help circumvent such free expression. They want, so they say, to protect against such engines of free speech. They claim as their own legitimate interest that they are in the business of obtaining Domain Names which might embarrass well-known enterprises if the names were allowed to fall into the hands of critics. Although a website exists at the Domain Name address and is stated to be "under construction", the Response is at pains to explain that this is not upon their instructions, the statement probably having been made by the Internet Service Provider.

The Respondents do not, [*9] however, act in a wholly altruistic spirit, since, as will be discussed further under Element 3, they seek substantial sums beyond its own costs before it will transfer over the offending registration. This latter aspect has to be brought into account in considering whether the Respondents therefore have any "right or legitimate interest" in the Domain Name, with which they otherwise have no association whatsoever and which they admit to have selected by reference to the Complainant's reputation in its own marks. The Panel finds that there is no justification for the role of officious interferer which the Respondents have taken upon themselves to provide in the manner in which they have chosen to do so. The Complainant has accordingly made out the second element (see likewise Case D2000-0477 (www.walmarkcanadasucks.com)).

Element 3: *that the Respondents registered and are using the Domain name in bad faith, in one of the senses of that term set out in Paragraph 4b of the Dispute Resolution Policy.*

Before lodging the Complaint, neither the Complainant nor its representatives had received any direct communication from the Respondents which would indicate that the Respondents were [*10] inviting an offer at more than the direct cost of the Domain Name registration as consideration for a transfer of the Domain Name to the Complainant. However, there is evidence that the Respondents had contemporaneously registered Domain Names in which "sucks" was associated with other well-known United Kingdom enterprises by referring to their names or abbreviations of them. In two of the five such cases which resulted in the jointly referred dispute proceedings, D 2000-0583 (www.directlinesucks.com) and D 2000-0681 (www.standardcharteredsucks.com), there was uncontroverted evidence that financial compensation above direct cost was being sought by the Respondents. In the particular circumstances of these cases taken together, the Panel finds that this evidence was properly filed in the present Complaint in order to show the Respondents' overall course of conduct.

In any case, the same motivation is demonstrated in the common Response to all these cases by the statements:

"The purpose of the company is to register email domains to prevent them becoming widely available. These names shall then be made available to the company concerned. No domain shall be made available to a competitive [*11] third party....

"Should the decision reached by yourselves be against our clients, the directors would of course be prepared to transfer the domain names to the relevant companies at cost."

Since the filing of the Complaint, the Respondents have contacted the Complainant's solicitors by fax and telephone in which they have said that a reason for the registration was to make a modest return for their initiative, that they might be prepared to accept £ 900-1200 for its transfer and that they wanted to make revenue from selling the site.

Thus it is clear that the Respondents' prime purpose in acquiring the names was to transfer the Domain Name at more than cost to the Complainant. Their Response claims that they are entitled to do so. The Dispute Resolution Policy, to which they became party as part of their registration contract, is to the contrary, since it provides in Paragraph 4(b)(i) that a domain name has been registered and is being use in bad faith if there are circumstances indicating that the registrant registered or acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant who is the [*12] owner of the trademark or service mark ...for valuable consideration in excess of documented out-of-pocket costs related to the domain name. The Respondents' motivation

falls within this definition of bad faith. Accordingly, in the Panel's opinion, the Third Element is also made out.

**6. Decision**

The Panel decides, in accordance with the Uniform Domain Name Resolution Policy, Paragraph 4a and 4b

- that the Domain Name in dispute is confusingly similar to the registered trade and service marks of the Complainant;
- that the Respondents have no rights or legitimate interests in respect of the Domain Name; and
- that the Domain Name has been registered and is being used in bad faith.

The Panel accordingly requires that the Domain Name WWW.DIXONSSUCKS.COM be transferred forthwith to the Complainant.

William R. Cornish

Panelist